# Massachusetts Municipal Wholesale Electric Co. v. State of Vermont, et al.

[639 A.2d 995]

No. 92-440

Present: Allen, C.J., Gibson and Morse, JJ., and Davenport, Supr. J. and Ellison, D.J. (Ret.), Specially Assigned

Opinion Filed February 4, 1994

*Stephen S. Ankuda* of *Parker & Ankuda, P.C.*, Springfield, and *Nicholas J. Scobbo, Jr.* and *Gerald J. Caruso* of *Ferriter, Scobbo, Sikora, Singal, Caruso and Rodophele, P.C.*, Boston, Massachusetts, for Plaintiff-Appellant.

*Jeffrey L. Amestoy*, Attorney General, and *William Griffin*, Chief Assistant Attorney General, Montpelier, for Defendant-Appellee State of Vermont.

*Peter H. Zamore* of *Sheehey Brue Gray & Furlong, P.C.*, Burlington, and *Christopher L. Dutton*, South Burlington, for Defendant-Appellee *Green Mountain Power Corp.*

*Edward B. French* of *Stackpole & French Law Offices*, Stowe, for Defendant-Appellee Village of Stowe.

*Edward V. Schwiebert* and *Laura E. Johnson* of *Abell, Kenlan, Schwiebert & Hall, P.C.*, for Defendants-Appellees Villages of Ludlow, Hardwick, Morrisville and Swanton.

**Gibson, J.** Plaintiff Massachusetts Municipal Wholesale Electric Company (MMWEC) appeals from a summary judgment order declaring valid its Stony Brook Power Project contracts with defendant Vermont utilities. MMWEC contends that the contracts are void ab initio under *Vermont Department of Public Service v. Massachusetts Municipal Wholesale Electric Co.*, 151 Vt. 73, 558 A.2d 215 (1988) (*MMWEC I*), which declared contracts for MMWEC's Seabrook Power Project void. MMWEC also argues that, on its face, 1989, No. 112, § 1 (Act 112, § 1) does not ratify the contracts, and, in any event, that the Vermont Legislature does not have the power to ratify them. Finally, MMWEC argues that, if Act 112 ratifies the Stony Brook contracts, it violates MMWEC's rights under the Due Process, Contract, and Commerce Clauses of the federal constitution. We hold that, although the Stony Brook contracts with the municipal utilities would have been void under *MMWEC I*, they nevertheless were ratified by Act 112, § 1 and are valid. In addition, we conclude that the contract with Green Mountain Power Corporation (GMP) is valid under *MMWEC I*.

MMWEC is a public corporation and political subdivision of the Commonwealth of Massachusetts that acts as a joint planning and action agency through which suppliers of electricity develop electric power supply programs for municipal utilities. It is governed by a board of nine directors, two appointed by the Governor and seven elected by member municipalities. Only Massachusetts municipalities having electric departments may be members. Vermont electric suppliers that contract with MMWEC are not represented on the Board.

Since 1976, MMWEC has been developing a bulk power supply system by obtaining ownership interests in electric power facilities through planning and acquisition vehicles called "projects." MMWEC finances a project by issuing long-term revenue bonds, which are secured by payments made by project participants under power sales agreements (PSAs). Project participants are both member and nonmember municipal electric suppliers who contract with MMWEC to purchase a share of "project capability," that is, "the amount of electric capacity and energy, if any, which the Project is capable of producing at any particular time . . . ." In exchange, project participants agree to pay monthly pro rata shares of the costs MMWEC incurs in acquiring, constructing, financing and operating the project. MMWEC retains all ownership interest in the project.

Under the terms of the PSAs, MMWEC establishes the amount of monthly payments to provide sufficient revenues to meet its full obligations, and project participants must set electric rates sufficient to pay their shares of MMWEC's project costs, including debt service. The PSAs are subject to MMWEC's General Bond Resolution, which vests in the MMWEC board of directors sole discretion to issue bonds for each project. The PSAs also restrict the participants' ability to issue nonproject debt and require project participants to make payments to MMWEC whether or not the project is completed or operating, thus shifting all risks of the project to participants.

One of MMWEC's projects is the Stony Brook Intermediate Unit, an oil-and-gas-fueled generating facility that MMWEC began building in 1977 in Ludlow, Massachusetts. In October 1977, defendants, the Villages of Ludlow, Hardwick, Morrisville, Stowe and Swanton, and GMP, executed PSAs to purchase shares of project capability of MMWEC's Stony Brook

project. The facility began commercial operation in 1981, and defendants have been receiving power pursuant to the Stony Brook PSAs since that time. The Stony Brook PSAs require the participants to pay MMWEC whether or not the project produces electricity. The validity of these PSAs is the subject of this action.

The enforceability of MMWEC PSAs was previously adjudicated in *MMWEC I*. In 1979, MMWEC executed PSAs with five Vermont municipalities and two Vermont electric cooperatives to sell shares of project capability of MMWEC's ownership interest in two proposed nuclear generating units known as Seabrook Units Nos. 1 and 2. The parties' rights and obligations under the Stony Brook PSAs are almost identical to those under the Seabrook PSAs. Seabrook was under construction but had not begun producing electricity in October 1985, when the Vermont Department of Public Service filed a complaint against MMWEC in superior court seeking a declaration that the Seabrook PSAs were invalid. Because the Stony Brook PSAs are virtually identical to the Seabrook PSAs, MMWEC filed this action in July 1986, initially requesting a declaration that the Stony Brook PSAs are valid. The parties stipulated to postponing those proceedings until this Court reached a decision regarding the Seabrook PSAs.

In *MMWEC I*, we held that the Seabrook PSAs were void ab initio because provisions assigning to MMWEC all decision-making power with respect to incurring debt and making expenditures constituted an impermissible delegation of legislative authority by the municipalities and electric cooperatives. 151 Vt. at 86, 89–90, 558 A.2d at 223, 224–25. In particular, we concluded that paragraph 3(a) of the PSAs constituted an impermissible delegation of spending authority because it provided that "MMWEC makes all decisions to incur, or to refrain from incurring, project debt." *Id.* at 82–83, 558 A.2d at 221. MMWEC thus had "exclusive control over the magnitude of the participants' monthly payments and over the duration of these payments." *Id.* at 83, 558 A.2d at 221. We also concluded that paragraph 5(f) violated the nondelegation doctrine by restricting the participants' "power to make expenditures with regard to other projects or purchases." *Id.* at 85, 558 A.2d at 222.

In response to *MMWEC I*, the Vermont Legislature enacted Act 112, § 1, which purports to ratify certain energy contracts

for electric capacity or energy from plants in operation by January 1, 1989. Subsequently, the parties to this action entered into a stipulation under which MMWEC amended its complaint to request a declaration that the Stony Brook PSAs are void on the ground that they are virtually identical to the Seabrook PSAs.

On cross-motions for summary judgment, the trial court held that this case is factually distinguishable from *MMWEC I* and thus the Stony Brook PSAs are not void ab initio under the reasoning of that case. Further, it held that by enacting Act 112, § 1, the Vermont Legislature had ratified the Stony Brook PSAs. Finally, it concluded that applying Act 112 to the Stony Brook PSAs does not violate MMWEC's constitutional rights. MMWEC appeals from these trial court rulings.

## I.

MMWEC first argues that the court erred in determining that *MMWEC I* does not control this case because the PSAs at issue here are indistinguishable from the PSAs in *MMWEC I*. We agree that *MMWEC I* controls as to the Vermont municipalities. *MMWEC I*, however, considered the validity of PSAs executed by municipalities and electric cooperatives only. It did not decide whether an investor-owned corporation was acting beyond its power by entering a similar PSA. Thus, we address the validity of the Stony Brook PSA executed by GMP separately.

In *MMWEC I*, we declared the Seabrook PSAs void because the Vermont municipalities impermissibly attempted to redelegate their legislative authority to incur debt and to make expenditures on other projects or purchases. *Id.* at 86, 558 A.2d at 223. A comparison of the contracts for the two projects reveals that the essential terms of the Stony Brook PSAs are almost identical to those of the Seabrook PSAs. Specifically, the Stony Brook PSAs contain the same two provisions that necessitated declaring the Seabrook PSAs void in *MMWEC I*. Both contracts impermissibly transfer to MMWEC exclusive control over decisions to incur project debt and to set the participants' monthly payment amounts. Both contracts restrict the power of the municipalities to incur other debts, thus limiting the future exercise of legislative authority. See *id.* at 83, 85, 558 A.2d at 221, 222.

Nonetheless, defendant municipalities proffer two bases for distinguishing the Stony Brook Project from the Seabrook Project. First, they argue that Stony Brook involved less risk than Seabrook because it concerned a gas-and-oil-fueled facility rather than a nuclear facility. Defendants maintain that the risk in undertaking a conventional gas-and-oil power plant is minimal. They equate MMWEC's authority under the Stony Brook PSAs to that of a general contractor, who supervises construction and acquires the materials. Because the risk was minimal, defendants maintain that the delegation of authority under the Stony Brook PSAs was permissible.

MMWEC disputes defendants' risk assessment, maintaining that Stony Brook may have been considered more risky at the time the PSAs were executed due to the oil embargoes of the late 1970s. This dispute need not be resolved here, however. As MMWEC contends, an evaluation of the risks of the two projects is irrelevant to our decision because we are not judging the projects; rather, we are determining the validity of the contracts.

Second, defendants emphasize that Stony Brook has been in operation for eleven years and that they have been receiving power and making payments throughout this period. Thus, they distinguish the Seabrook Project because neither Seabrook unit had ever been in operation at the time of the decision in *MMWEC I*. According to defendants, the decision in *MMWEC I* turned in part on the fact that defendants were required to make monthly payments to MMWEC but had never received any power. They maintain that, in contrast to the Seabrook PSAs, which were for "project capability," the Stony Brook PSAs became contracts for electric capacity and energy when defendants began receiving power from the Stony Brook Unit.

Defendants' characterization of the Stony Brook PSAs as contracts for electric capacity and energy, as opposed to project capability, is incorrect. Under the terms of the PSAs, defendants purchased project capability, and if Stony Brook stopped operating today, the PSAs require that defendants continue to make payments to MMWEC. Further, our decision in *MMWEC I* was not influenced by the fact that the Seabrook Units had not produced any power. See *id.* at 90, 558 A.2d at 225. Thus, whether or not the Vermont utilities are currently receiving

electrical power pursuant to the Stony Brook PSAs is irrelevant to our decision here.

■ Defendant Village of Stowe also argues that when the Stony Brook facility was completed in 1981 and defendants began receiving power in return for payments, the PSAs executed in 1977 were "confirmed." It contends essentially that, because the party that acted ultra vires has received benefits under the contract for eleven years, the contract is somehow ratified. The other municipalities contend that they have ratified the PSAs by continuing to perform pursuant to them for eleven years. Defendants cite no authority to support either contention, nor do we find any. On the contrary, it is generally held that an ultra vires contract cannot be ratified by any action of the corporation that acted outside its authority. *Metropolitan Stock Exch. v. Lyndonville Nat'l Bank*, 76 Vt. 303, 308, 57 A. 101, 102 (1904); see also 10A E. McQuillin, The Law of Municipal Corporations § 29.104.30, at 67 (3d ed. 1990) (municipality cannot ratify a contract that it was not legally permitted to enter into).

Defendants also argue that they have not impermissibly redelegated their authority because they have retained a voice in decisionmaking concerning Stony Brook through their participation in the New England Power Pool (NEPOOL). The Stony Brook unit is subject to central dispatch by NEPOOL. Defendant municipalities may influence NEPOOL as shareholders of the Vermont Electric Power Company (VELCO) because VELCO is a charter member of NEPOOL. The parties, however, dispute the extent and the effectiveness of defendants' influence through NEPOOL on MMWEC's decisions regarding Stony Brook.

Initially, we note that the same provisions regarding NEPOOL were present in the Seabrook PSAs. Thus, we cannot distinguish this case from *MMWEC I* on the ground that the municipalities retained a voice in decisionmaking through NEPOOL. Moreover, even if defendants can influence MMWEC's operation of Stony Brook through NEPOOL, this does not affect the PSA restrictions upon defendants' ability to incur other debts. These restrictions are also impermissible delegations of authority. See *MMWEC I*, 151 Vt. at 86, 558 A.2d at 223. The NEPOOL participation is simply too narrow to affect the illegality of the broad redelegation of authority found in the PSAs.

Because the pertinent contractual provisions in the Stony Brooks PSAs are virtually identical to those in the Seabrook PSAs, we find no basis to distinguish the redelegation of legislative power in the Stony Brook PSAs. Therefore, we hold, under *MMWEC I*, that the Stony Brook PSAs executed by the five Vermont municipalities violate the nondelegation doctrine and would be void had they not been ratified by the Legislature.[1]

## II.

MMWEC argues that, by its terms, Act 112, § 1 does not validate the Stony Brook PSAs executed by the municipalities. Act 112, § 1 provides in part: "All contracts for the purchase, sale, generation, manufacture, acquisition or transmission of *electric capacity or energy* entered into pursuant to chapters 14, 79, 81, 83 or 84 of Title 30 . . . are hereby validated, ratified, and confirmed . . . ." 1989, No. 112, § 1 (emphasis added). MMWEC contends that the Act does not apply to the Stony Brook PSAs because they are contracts to purchase "project capability," not "electric capacity or energy." We agree that *MMWEC I* makes this distinction but nonetheless hold that the legislative history unequivocally shows that the Legislature intended Act 112 to ratify the Stony Brook PSAs.

In *MMWEC I*, the Court distinguished "project capability" from "electric capacity and energy." "Project capability" is defined in the PSAs as "the amount of electrical capacity and energy, if any, which the Project is capable of producing at any particular time . . . ." Thus, by contracting to purchase project capability, the utilities agreed to make payments to MMWEC whether or not they received any power in return. *MMWEC I*, 151 Vt. at 79, 558 A.2d at 218. In contrast, "electric capacity and energy" refers to actual supplies of capacity and energy that exist in ascertainable amounts. *Id.* at 78, 558 A.2d at 218. On the basis of this distinction, we held that 30 V.S.A. § 4002, which authorizes utilities jointly to purchase "supplies of capacity and energy," does not authorize utilities to purchase "project capability." *Id.* Because § 4002 authorizes utilities to enter into con-

---

[1] Defendant municipalities raise a number of defenses to MMWEC's claim that the PSAs are invalid. Because we hold that the Legislature successfully ratified the PSAs, we do not reach these issues.

tracts for capacity and energy and does not authorize them to enter into contracts for project capability, we must conclude that Act 112, § 1, which ratifies contracts for electric capacity or energy, does not ratify contracts for project capability. On its face, Act 112 does not evidence a legislative intent to ratify contracts for project capability.

Defendants contend, however, that "[t]he legislative history of [Act] 112 demonstrates the Vermont Legislature's clear intent to validate the Stony Brook PSAs." In construing a statute, our primary objective is to give effect to the Legislature's intent. *Burlington Elec. Dep't v. Vermont Dep't of Taxes*, 154 Vt. 332, 335, 576 A.2d 450, 452 (1990). Ordinarily, we rely on the plain meaning of the language and look no further because we presume the Legislature states what it intends. *Chamberlin v. Vermont Dep't of Taxes*, 160 Vt. 578, 580, 632 A.2d 1103, 1104 (1993). Nevertheless, principles of statutory construction are not absolutes, and "[w]here such a presumption is doubtful, the 'plain' meaning of the words will not necessarily control," *id.* at 580, 632 A.2d at 1104, for, ultimately, "it is [the legislative] intent which constitutes the law." *Hill v. Conway*, 143 Vt. 91, 93, 463 A.2d 232, 233 (1983). We find that the clear intent of the Legislature was to validate and ratify all contracts for the purchase of electric capacity or energy, or project capability, from facilities that were in commercial operation as of January 1, 1989, including the Stony Brook contract.

We cannot ignore the substantial, well-documented, legislative history of Act 112, § 1. Act 112, § 1 was introduced with the express purpose of validating contracts put in jeopardy by *MMWEC I*. Throughout several days of testimony by more than a dozen witnesses, the need to save PSAs similar to Seabrook was thoroughly discussed, and the Stony Brook PSAs were specifically named as being among the endangered contracts to be saved. See, e.g., Hearings on H. 270 before House Commerce Committee, Mar. 3, 1989, at 12–19 (testimony of Stephen Walke, General Counsel for Vermont Public Power Supply Authority (VPPSA) and Village of Swanton) (bill's purpose is to validate contracts that had come into question as result of *MMWEC I*); *id.* at 50–51 (testimony of Richard Saudek, former Commissioner of the Department of Public Service) (bill reverses most of *MMWEC I*, except for specific ruling on Sea-

brook PSAs, and validates "all existing agreements"); *id.* at 56 (using Stony Brook as example of MMWEC contract that should be saved); see also Hearings on H. 270 before House Commerce Committee, Mar. 16, 1989, at 4–5, 10–11 (testimony of Jack Collins, chairman of VPPSA and employee of Village of Ludlow Electric Light Department) (explaining problem of power contracts whose validity has been questioned as result of *MMWEC I*, using Stony Brook PSA as example); Hearings on H. 270 before Senate Finance Committee, Apr. 25, 1989, at 31–35 (testimony of Fred Hutchins, Stowe Electric Company) (speaking in support of bill because it would save Stony Brook PSA); *id.* at 55 (testimony of Richard Saudek) (purpose of bill as amended is "essentially approving contracts that are now producing power, that are now in place and trying to remove any cloud from them"); *id.* at 81–83 (testimony of Stephen Walke) (assuring committee that MMWEC will continue to honor Stony Brook contract if Legislature ratifies it but that, without legislative ratification, it was "as dead as the Seabrook contract was"). In addition, the Stony Brook PSAs were included on a list, requested by the Senate Finance Committee, of contracts to be ratified. See Hearings on H. 270 before Senate Finance Committee, Apr. 27, 1989, at 24–25 (testimony of Stephen Walke) (presenting list of existing PSAs in effect before January 1, 1989, that were to be validated by Legislature); see also Attachment A to Affidavit of Shirley Adams, administrative secretary for Legislative Council for Vermont General Assembly (May 26, 1992) (copy of list of PSAs to be validated) and *id.* at 1–2 (authenticating the list).

As the hearings became bogged down with other issues, the legislators became increasingly dependent on experts to explain utility terms of art. But there is no discussion in the legislative record about the difference between contracts for "project capability," and contracts for "electric capacity or energy." The Stony Brook PSAs, like the Seabrook PSAs, are written for "project capability" as that term is defined in *MMWEC I*. We cannot account for why the Legislature, which had both *MMWEC I* and the Stony Brook PSAs before it, did not recognize the distinction. Perhaps the drafters reasoned that, because Stony Brook, unlike Seabrook, was actually producing energy and had done so since 1981, it was more accurately described as a contract for electric capacity or energy.

Certainly, the common meaning of the words, if not the utility term of art, conveys this thought. But whatever the explanation for this anomaly, we cannot use it to defeat the overriding purpose of the legislative act. Throughout the confusing and protracted legislative process, the Legislature's intent to save the PSAs endangered by *MMWEC I*, including the Stony Brook PSAs, was unwavering and unmistakable.

■ In using this approach, we emphasize that we are not relying on a few statements sprinkled throughout hundreds of transcript pages. Saving the Stony Brook PSAs was virtually the sole focus of the legislative hearings. The question was not whether to save the PSAs, but how. A dozen witnesses—lobbyists, regulators, municipal officials, attorneys—spoke in favor of saving the PSAs and stated that the proposed legislation would accomplish this end. There was no serious opposition to the legislation,[2] and no one put forth the view that the legislation was flawed. This is a rare case where the legislative history clearly and unequivocally speaks the legislative intent and must govern our construction of the statutory language.

### III.

■ MMWEC contends that the Legislature cannot ratify the Stony Brook PSAs because they are void ab initio, see *MMWEC I*, 151 Vt. at 86, 558 A.2d at 223, and therefore no contract exists to validate. In *MMWEC I*, however, the PSAs were void because the municipalities' execution of the agreements was ultra vires,

---

[2] MMWEC puts forth a single statement of Sen. Vincent Illuzzi to show that the legislative history "equally supports MMWEC's position that the Legislature did not intend to ratify the Stony Brook PSA." This statement, made before the Senate Finance Committee (April 25, 1989, at 83), was: "In fairness to MMWEC, though maybe that contract [the Stony Brook PSA] should be opened up. Right? I mean they got screwed on the other one [Seabrook]." The response of other participants, however, undercuts MMWEC's position:

Sen. Webster: You're just kidding, right?

Mr. Walke: I hope he's just kidding. I hope you're representing Vermont ratepayers and not Massachusetts ratepayers.

Sen. Ready: You never know.

Sen. Illuzzi: Fair is fair.

At that point, the discussion ended and Sen. Illuzzi's point was not pursued.

that is, the municipalities went beyond their authority by re-delegating legislative spending power. *Id.* Although, ordinarily, contracts that are void ab initio cannot be revived, this rule does not apply to legislative ratification of ultra vires contracts. *New Haven Water Co. v. City of New Haven*, 40 A.2d 763, 766 (Conn. 1944). To the contrary, the general rule is that

> provided it had the power to authorize the making of the contract in the first instance, the legislature of the state has power to legalize or ratify an ultra vires contract entered into by a municipal corporation for a public purpose, and when thus ratified the contract will be valid and binding.

10A E. McQuillin, *supra*, § 29.109, at 88 (footnote omitted); see, e.g., *New Haven Water Co.*, 40 A.2d at 765–66; *Williamson Real Estate Co. v. Sasser*, 103 S.E. 73, 74 (N.C. 1920); see also *Richford Savings Bank & Trust Co. v. Thomas*, 111 Vt. 393, 399, 17 A.2d 239, 242 (1941) (because Legislature has taxing power and can direct towns on manner of making appraisals and grand list, it has power to validate improper grand list).

■ MMWEC next contends that, because the Legislature can only validate contracts that it might have originally authorized, it cannot validate the PSAs because it cannot delegate its spending power. The Legislature cannot delegate functions that are "'purely and strictly legislative.'" *Village of Waterbury v. Melendy*, 109 Vt. 441, 453, 199 A. 236, 242 (1938) (quoting *Sabre v. Rutland R.R.*, 86 Vt. 347, 365, 85 A. 693, 701 (1913)). The power to enact laws is inherently legislative and nontransferable. *Vermont Educ. Bldgs. Fin. Agency v. Mann*, 127 Vt. 262, 267, 247 A.2d 68, 72 (1968). The Legislature may, and indeed as a practical matter must, confer broad discretion on other agencies to execute its laws. *Id.* The Legislature's authority to delegate to others the power to negotiate and execute "contracts to achieve a valid public objective" is long settled. *Id.* at 268, 247 A.2d at 72 (citing power contract cases as examples).

■ *MMWEC I* presents no obstacle to legislative delegation of the spending power. Rather, the decision condemns only municipal redelegation of such power without specific legislative authority to do so. See 151 Vt. at 86 n.3, 558 A.2d at 223 n.3 (legislative power granted to municipality can only be redelegated to third party if "'"such was the clear intent of the legis-

lature"'") (quoting *Arkansas-Missouri Power Co. v. City of Kennett*, 78 F.2d 911, 921 (8th Cir. 1935) (quoting *National Water Works Co. of New York v. City of Kansas*, 20 Mo. App. 237, 242 (1886))). The nondelegation doctrine thus condemns municipalities putting legislative powers beyond legislative intent. But if the Legislature could have entered a PSA or authorized a municipality to enter one in its behalf, then it can ratify a PSA. Under this theory, curative statutes have been used to validate unauthorized expenditures or indebtedness by municipalities. 2 E. McQuillin, *supra*, § 4.15, at 49 (3d ed. 1988); see, e.g., *Palmcroft Dev. Co. v. City of Phoenix*, 49 P.2d 626, 631 (Ariz. 1935); *Otter Tail Power Co. v. City of Colman*, 121 N.W.2d 483, 485–86 (S.D. 1963).

■ MMWEC argues that because the declaratory judgment action was filed prior to the passage of Act 112, Act 112 cannot apply in this case. Its argument is based on 1 V.S.A. § 213, which states that acts of the general assembly "shall not affect a suit begun or pending at the time of their passage."[3] Section 213 is a rule of statutory construction, not a grant of substantive rights or a bar on retrospective application of statutes. As a rule of construction, § 213 does not apply if it contradicts "the manifest intent of the general assembly." 1 V.S.A. § 101. Thus, if the Legislature chooses to make legislation retroactive and makes that intent clear, as it specifically has done here, § 213 is not a bar. See *Burlington Fire Fighters' Ass'n v. City of Burlington*, 149 Vt. 293, 296, 543 A.2d 686, 688–89 (1988) (retroactive application of legislation is valid if Legislature so intends).

## IV.

Although we hold that the Legislature successfully validated the Stony Brook PSA, constitutional bars may, nevertheless, render Act 112 void. MMWEC argues that validating legislation violates its rights under the Due Process, Contract, and Commerce Clauses of the federal constitution. We disagree.

---

[3] MMWEC argues in the alternative that Act 112 is rendered inoperative by 1 V.S.A. § 214(b)(2) and (4), which respectively define the effect of statutory amendments on preexisting rights and pending court proceedings. MMWEC then concedes, however, that Act 112 does not amend or repeal any existing statute, and that therefore § 214 does not apply. We agree and do not reach this issue.

MMWEC first argues that it has a vested right in the power generated at the Stony Brook facility—that is, the right to sell it to whom it chooses under the terms it desires—which cannot be destroyed without due process. The federal Due Process Clause only prohibits retrospective civil legislation if its consequences are particularly "'harsh and oppressive.'" *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17 n.13 (1977) (quoting *Welch v. Henry*, 305 U.S. 134, 147 (1938)). Even assuming vested rights are involved, "'legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.'" *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976)). Retroactive legislation needs to meet no higher burden; the test for constitutionality is to show merely that the "retroactive application of the legislation is itself justified by a rational legislative purpose." *Id.* at 730.

Here, the Legislature did not act arbitrarily or irrationally by validating the Stony Brook PSAs. Although the agreements were entered into by municipalities acting ultra vires, there is no indication that they were not otherwise properly bargained for. The parties relied on the contracts for eleven years. Power was produced and used as the contracting parties intended. Act 112 is curative legislation, attempting to normalize contractual relationships that had been called into question by *MMWEC I*. The Legislature did not pick and choose between the PSAs, validating some and not others; it simply validated all agreements endangered by *MMWEC I*. Retroactive application of the validating legislation was necessary so that the operation of the PSAs was uninterrupted.

MMWEC also contends that Act 112 impairs its contractual rights by binding it to obligations that did not exist prior to its passage. The Contract Clause requires a more stringent analysis than the Due Process Clause. *Pension Benefit*, 467 U.S. at 733. The Contract Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const., Art. I, § 10. Yet, despite the absolute language of the Clause, the United States Supreme Court has held

that it "does not operate to obliterate the police power of the States," *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978), the state's power to promote the general welfare of its citizens being "'paramount to any rights under contracts between individuals.'" *Id.* (quoting *Manigault v. Springs*, 199 U.S. 473, 480 (1905)). Consequently, the Court has created a balancing test, which weighs the restriction on contract rights against the state's interest in regulation. *Id.* at 244–45.

The first inquiry under this test is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* at 244. MMWEC cannot cross this threshold. Not every legislative act affecting contractual relationships is an impairment. The Contract Clause has traditionally focused on legislation "designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors were unable to satisfy," *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1987), that is, where the legislature adds or deletes contract obligations, in effect rewriting what the parties bargained. No such intervention is at issue here. The parties' bargain has not been abrogated or altered by Act 112. Instead, the Act seeks to reinforce the parties' ability to rely on their own agreements. See *Allied Structural Steel*, 438 U.S. at 245 (constitutional framers placed high value on parties' ability to order their business in reliance on their contracts). *MMWEC I* called the validity of PSAs into question. The Legislature did not rewrite the PSAs; it restored certainty to the parties' contractual relationship. Because the Legislature's actions are not a contract impairment, the Contract Clause does not apply.

Finally, MMWEC argues that Act 112 violates the Commerce Clause because it is a "protectionist measure" designed to benefit Vermonters at the expense of MMWEC's other customers. Validating the Stony Brook PSAs gives Vermonters no advantage over other MMWEC customers; it simply means that Vermonters will have the same benefits as out-of-staters contracting with MMWEC for Stony Brook power. Act 112 neither discriminates against interstate commerce nor favors in-state economic interests over out-of-state ones, directly or indirectly. See *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986). MMWEC's real dissatisfaction is that the Legislature chose to validate Stony Brook

but not Seabrook. The invalidation of the Seabrook PSA in *MMWEC I* undoubtedly did result in benefits to Vermont consumers over out-of-staters, but it is not the impact of Seabrook that is at issue in this case.

## V.

MMWEC contends that GMP's Stony Brook PSA is also governed by the holding of *MMWEC I* because in that case the Court also recognized limitations on the authority of private corporations to delegate their powers and duties to others. See *MMWEC I*, 151 Vt. at 88–89, 558 A.2d at 224. GMP counters that *MMWEC I* does not invalidate its Stony Brook PSA because *MMWEC I* did not address the validity of PSAs executed by investor-owned corporations; rather, its holding was limited to PSAs executed by municipal utilities and cooperatives. We agree with GMP. The discussion regarding private corporations in *MMWEC I* related to the issue of whether cooperatives were public or private corporations. *MMWEC I* did not consider the validity of PSAs executed by corporations, whose authority to act arises pursuant to the Vermont Business Corporation Act (VBCA), because this issue was not before the Court. Accordingly, its holding does not extend to GMP's PSA with MMWEC.

MMWEC contends that the VBCA provides no specific grant of authority permitting GMP to delegate GMP's spending power or to restrict GMP's future incursion of debt. Consequently, MMWEC maintains, because GMP's board of directors has unlawfully abdicated its management functions in the PSA, GMP's PSA is ultra vires and void. We do not decide whether GMP had the authority to enter the PSA because we conclude that 11A V.S.A. § 3.04 precludes declaring the PSA ultra vires.

Section 3.04(a) provides that, with certain enumerated exceptions, "the validity of corporate action may not be challenged on the ground that the corporation lacks or lacked power to act." This statute was adopted from § 3.04 of the Model Business Corporation Act, and, like the model act, eliminates the doctrine of inherent incapacity, except in actions (1) by a shareholder against the corporation, (2) by the corporation against an incumbent or former director, officer, employee, or agent of

the corporation, or (3) by the attorney general.[4] See Comment to Model Business Corporation Act § 3.04 (1984). Because none of the three exceptions applies here, MMWEC is precluded from asserting GMP's lack of capacity in this declaratory action. See *Ohio Cent. Credit Union, Inc. v. Wagner*, 426 N.E.2d 198, 199 (Ohio Ct. App. 1980) (similar statute forbids assertion that act was ultra vires in action between two corporations).

## VI.

Finally, MMWEC asserts the trial court erred by failing to declare that the Stony Brook PSAs do not constitute unauthorized "debt" under 24 V.S.A. § 1822 (municipality must obtain voter approval before exercising bonding power in connection with public utility project). It requests a remand so the trial court can make such a declaration.

■ The trial court correctly refrained from deciding the issue. For a court to make a declaratory judgment, it must have before it an actual or justiciable controversy. *Doria v. University of Vermont*, 156 Vt. 114, 117, 589 A.2d 317, 318 (1991). Otherwise, the judgment is merely an advisory opinion, which the court lacks constitutional authority to render. *Id.* Consequently, "declaratory relief is available only when a party is suffering from 'the threat of actual injury to a protected legal interest.'" *Id.* (quoting *Town of Cavendish v. Vermont Pub. Power Supply Auth.*, 141 Vt. 144, 147, 446 A.2d 792, 794 (1982)). The claimed consequences of the controversy "must be so set forth that the court can see that they are not based upon fear or anticipation but are reasonably to be expected." *Robtoy v. City of St. Albans*, 132 Vt. 503, 504, 321 A.2d 45, 46–47 (1974).

In its amended complaint, MMWEC asked for a declaration that § 1822 had not been violated, asserting that, in *MMWEC I*, defendants Village of Stowe and State of Vermont had argued that the Seabrook PSAs violated § 1822. In *MMWEC I*, however, the trial court held that the Seabrook PSAs were not debts under § 1822. That part of the decision was not appealed by any party.

---

[4] 11A V.S.A. § 3.04 went into effect on January 1, 1994. It replaces, but retains the essential elements of, its predecessor statute, 11 V.S.A. § 1854. While § 3.04 is based on the 1984 version of the Model Business Corporation Act, § 1854 was based on the 1972 version of the same model act.

In their answers to MMWEC's amended complaint, all defendants denied that the Stony Brook PSAs violated § 1822. No party, at any time, took the position that the Stony Brook PSAs were unauthorized debts. MMWEC did not pursue the issue at the summary judgment hearing. On appeal, the Village of Stowe, which was the only party to brief the issue, argues in favor of MMWEC's position. MMWEC has failed to establish that an actual controversy existed for the trial court to resolve.

*Affirmed.*