2006 VT 38

## J. Kent Sweezey v. Hartley Neel, Virginia Neel and Morristown Landowner's Association

[904 A.2d 1050]

No. 04-225

Present: **Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Gibson, J. (Ret.),** Specially Assigned

Opinion Filed May 5, 2006

---

*Robert F. O'Neill* and *Heather Rider Hammond* of *Gravel and Shea*, Burlington, for Plaintiff-Appellee/Cross-Appellant.

*Christopher D. Roy* of *Downs Rachlin Martin PLLC*, Burlington, for Defendants-Appellants/Cross-Appellees.

¶ 1. **Reiber, C.J.** This case concerns a longstanding dispute over plaintiff J. Kent Sweezey's encroachment upon a deeded easement traversing his property. Ultimately, the superior court allowed plaintiff to bend the easement around a new addition to his house and prohibited the easement's owner from using the right-of-way as an avenue for future development of the dominant estate. The easement's owner, a landowner's association comprised of two couples, appeals several aspects of the superior court's decision. Plaintiff

cross-appeals, asking this Court to allow servient landowners to obtain court approval to unilaterally relocate easements in a manner that does not unduly burden the dominant estate. We conclude that the superior court acted prematurely in prohibiting use of the easement as an avenue for any future development on defendants' adjoining property, but the court did not err in allowing plaintiff to bend the easement around his addition. We decline, however, plaintiff's request that we abandon the general rule that easements cannot be relocated without the consent of both the servient and dominant landowners.

¶ 2. For the most part, the facts and procedural history of this case are undisputed. In 1965, William and Marian Bernhard transferred to themselves and another couple a portion of a large parcel of land that they had purchased in the 1950s. In consideration of the transfer, the other couple agreed to construct an eight-acre pond and boathouse on the property. Earthmoving and other equipment used to construct the pond and boathouse accessed the conveyed property by way of a shallow portion of a nearby stream. Out of concerns for potential liability, ownership of the property was placed in the couples' corporation, Kimibakw, Inc. As part of the conveyance, the Bernhards deeded to the corporation a fifty-foot-wide easement over their retained parcel to allow access to the conveyed property. The easement starts as a single path and then diverges into an upper and lower fork, forming a "Y" into the dominant estate.[1] The deed conveying the easement does not describe the right-of-way by metes and bounds.

¶ 3. In July 1978, Kimibakw sold the property to defendant Morristown Landowner's Association, which was comprised of Virginia and Hartley Neel and four other couples. Thereafter, the Association's members and guests used the deeded easement for vehicular and other access to and from the Association property. In 1988, the Bernhards built a home on their retained parcel, the servient estate. In doing so, the Bernhards upgraded as a driveway the first 1100 feet of an access road that was later ruled to be part of the disputed easement. The Neels initially challenged the location of utility poles placed near the Bernhards' home, but eventually dropped that challenge after conferring with Mrs. Bernhard.

---

[1] The deed actually conveyed two easements forming the "Y," but, for the sake of simplicity, we will refer to them as one easement.

¶ 4. In 1997, Mrs. Bernhard sold the servient estate to plaintiff J. Kent Sweezey. At this point, the Neels and another couple, the Redlichs, were the only remaining members of the Association. In advance of the closing, plaintiff had a survey of the property done. The survey, which was recorded in the town land records, was consistent with a 1977 unrecorded survey with respect to the location of the easement. In 1998 and 1999, plaintiff worked on the upper fork of the easement in the hopes of converting it into a ski trail. At the same time, he began constructing an alternative road that would replace the deeded easement. In August 1999, plaintiff met with Mr. Neel to discuss the possibility of the Association members using the alternative road for ingress and egress to the Association's property. Plaintiff explained that he was anticipating building an addition to his house and wanted to reduce the traffic on the access road running near the house. Mr. Neel indicated that he would consider using the proposed alternate route.

¶ 5. In November 1999, plaintiff began work on his planned addition. Shortly thereafter, Mr. Neel telephoned him to complain about the addition. After telephoning his contractor, plaintiff learned that no building permit had been obtained. Plaintiff halted the construction and applied for a permit. In December 1999, Mrs. Neel and the Association's attorney attended a hearing before the town development review board, arguing that the permit should not be issued because the proposed addition would encroach upon the Association's easement. The board responded that it lacked jurisdiction to establish the location of the easement, but encouraged the parties to work out a solution to the problem. In response, plaintiff, his attorney, Mrs. Neel, and the Association's attorney met in private before returning to the meeting to announce that they had reached an agreement. The details of the agreement are in dispute, but, at minimum, they agreed that the Neels would have an engineer inspect the alternative road in the spring to determine whether it was a suitable substitute for the deeded easement. The board eventually issued the building permit, and, in the ensuing months, plaintiff completed construction of his addition, which came within ten feet of the fifty-foot easement's centerline.

¶ 6. In late April 2000, plaintiff's attorney sent the Association's attorney a letter inquiring about a schedule for having an engineer inspect the alternative road. The following month, the Association's attorney responded by stating that the Neels were reluctant to hire an engineer unless the parties could agree that the proposed right-

of-way was for "unlimited access" to the dominant estate. Plaintiff's attorney then accused defendants of trying to impose new conditions on their agreement to use the alternative road as long as it proved to be a suitable substitute for the deeded easement. Plaintiff threatened legal action if an agreement could not be reached within ten days.

¶ 7. In June 2000, plaintiff filed suit and obtained an ex parte temporary restraining order preventing the Association from using the deeded easement. Thereafter, the parties agreed to an interim order allowing the Association to use the alternative road and upper and lower forks of the easement but prohibiting vehicular traffic on the upper fork pending resolution of their cross-motions for a preliminary injunction. In June 2001, in response to cross-motions for summary judgment on certain issues, the superior court ruled that the scope of defendants' permissible use of the easement "includes pedestrians and vehicles of the kind ordinarily permitted on unpaved public roads in Vermont such as may be reasonably necessary to access the dominant estate." In its October 2001 ruling on the parties' cross-motions for a preliminary injunction, the court denied plaintiff's requests for injunctive relief and granted defendants' request for a preliminary injunction based on its conclusions that the location of the deeded easement was clearly marked and plaintiff had encroached upon the easement without obtaining defendants' consent.

¶ 8. In the fall of 2003, following a four-day bench trial before a different judge, the superior court issued a final decision upholding the court's earlier rulings with respect to the location of the easement and denying, for the most part, plaintiff's requests for injunctive relief. Nevertheless, the court allowed plaintiff to keep his addition intact by constructing a bend in the easement away from his house up to a distance of fifty feet. The court also determined that the scope of the deeded easement did not include its use as an avenue for future development of the Association's property.

¶ 9. Defendants appeal the superior court's decision, arguing, among other things, that the trial court erred by relocating the course of the deeded easement and by restricting the scope of the use of the easement with respect to future development. Plaintiff cross-appeals, asking this Court to adopt the position that the owner of a servient estate can, with court approval, unilaterally relocate a deeded easement not set forth in metes and bounds, as long as the relocated easement does not frustrate the use and enjoyment of the dominant estate.

I.

■ ¶ 10. We first consider defendants' argument that the superior court erred by allowing plaintiff to bend the easement up to fifty feet from his house rather than requiring him to remove his encroaching structure. In support of this argument, defendants rely upon two general principles of property law. The first "is that the owners of both the dominant and servient estates must consent to relocate an easement." *In re Shantee Point, Inc.*, 174 Vt. 248, 261, 811 A.2d 1243, 1254 (2002); see *Sargent v. Gagne*, 121 Vt. 1, 12, 147 A.2d 892, 900 (1958) ("It is the general rule that a way, once located, cannot be changed thereafter without the mutual consent of the owners of the dominant and servient estates."). This rule is tempered, however, by the accepted notion that mutual consent to a relocation "may be implied from the acts and acquiescence of the parties." *Sargent*, 121 Vt. at 12, 147 A.2d at 900. If the actions of the dominant estate's owner indicate acquiescence to an easement's changed location, the dominant estate is equitably estopped from claiming an entitlement to the former location. *Wagoner v. Jack's Creek Coal Corp.*, 101 S.E.2d 627, 630 (Va. 1958); cf. *Mann v. Levin*, 2004 VT 100, ¶¶ 25-28, 177 Vt. 261, 861 A.2d 1138 (determining whether facts supported applying doctrine of equitable estoppel to preclude enforcement of restrictive covenant).

■ ¶ 11. The second general principle relied upon by defendants is that one who seeks the enforcement of an established legal property right is entitled to injunctive relief irrespective of the relative hardships of the parties. See *Welch v. Barrows*, 125 Vt. 500, 508, 218 A.2d 698, 705 (1966). In the cases cited by defendants, however, we have strictly applied this general principle in the context of the enforcement of restrictive covenants. See *Mann*, 2004 VT 100, ¶ 29 ("Because this case involves the enforcement of a restrictive covenant, no balancing of hardships was required."); *McDonough v. W.W. Snow Constr. Co.*, 131 Vt. 436, 441, 306 A.2d 119, 122 (1973) ("Basic to the enforcement of restrictive covenants is that they are enforceable through the equitable relief afforded by an injunction."). Indeed, in *Welch*, we acknowledged that many courts balance the relative hardships in determining whether to require the removal of a permanent encroachment onto another's property, but we declined to do so in that case, which involved a request to enforce a restrictive covenant. 125 Vt. at 508, 218 A.2d at 705.

■ ¶ 12. Contrary to enforcing restrictive covenants, locating easements often allows some flexibility in terms of creating a remedy that is satisfactory to all parties. Although the owner of an easement is generally entitled to injunctive relief when the servient estate encroaches upon the easement, see *Knudson v. Leach*, 142 Vt. 648, 651, 458 A.2d 1140, 1142 (1983) ("If the right of way is illegally obstructed, the owner of the right is entitled to injunctive relief."), the trial court is not necessarily confined to requiring the removal of the encroaching structure irrespective of the extent or impact of the encroachment. *Cf. Renaissance Dev. Corp. v. Universal Props. Group, Inc.*, 821 A.2d 233, 238 (R.I. 2003) (stating general rule that continuing trespass entitles owner of easement to mandatory injunction, but noting that coercive relief may be withheld in exceptional cases where encroachment causes little or no damage). Further, as indicated above, acquiescence may equitably estop the owner of an easement from demanding removal of an encroaching structure.

¶ 13. We conclude that, under the particular circumstances of this case, the superior court did not err in allowing plaintiff to bend defendants' easement to avoid having to move a permanent structure that encroached a few meters onto the original easement. From the beginning of this dispute, defendants indicated that they would accept, at minimum, a slight relocation of their easement, as long as they retained a legal right to an equally suitable right-of-way. At the development review board hearing, Mrs. Neel made the following statement:

> If Mr. Sweezey at some point came up with an alternative which was as good an access and which everybody agreed to use, that's a possibility, because we just as soon be more private and they just as soon be more private. But . . . [w]e have to have legal right to it just the way we have legal right to this, and we can't give up this until we have another, and we can't give up this til we're sure we want another. . . . [D]epends what it's like. So we'd have to talk and have engineers look at it and that kind of thing. . . .
>
> . . . .
>
> . . . [W]e did offer a possibility . . . that if they wanted to give us alternative legal use farther out so that they could finish their house we could do that for now. So we'd bend the right-of-way out, let them finish the house but it would all

have to be legal. And then next summer when we could have engineers come in and look at alternatives we'd be[] willing to [do] that, but it would allow them to finish their house in the meantime. But there are not five people that own the pond property anymore, just two, but I'd have to get their ok also. So that's an idea.

¶ 14. Based on this and other testimony, the board minutes stated that Mrs. Neel expressed a willingness "to bend the right-of-way if an engineer says the road is up to standards." The minutes also stated that "[b]oth sides expressed an interest in working out the right-of-way and the start of construction was not really an issue."

¶ 15. Before the superior court, Mrs. Neel testified that, at the parties' private conference during the board hearing, she told plaintiff that the Association would consider allowing him to continue building his addition only if he gave them a legal right-of-way around his house. According to her, he rejected that idea, so she told him that nothing could be done until the spring when an engineer could look at the alternative road. The Association's attorney, who was present with Mrs. Neel at that private conference, testified that he did not recall whether everyone understood at the end of the conference that plaintiff could continue building, but he conceded that no one told plaintiff not to continue building. He also testified that he informed the board after the parties ended the conference that an agreement had been reached.

¶ 16. Plaintiff had a slightly different recollection of what was said. According to him, Mrs. Neel indicated that she had no desire to interfere with plaintiff's enjoyment of his privacy, but that the Association had to be sure that an alternative road was acceptable. Plaintiff testified that Mrs. Neel agreed to withdraw objections to the building permit and indicated that an engineer would inspect the alternative road the following spring. When he left the conference, he believed that defendants had agreed to allow him to obtain the building permit and continue with the construction of his addition.

¶ 17. Defendants argue that the evidence was insufficient to support the trial court's apparent ruling that they were equitably estopped from demanding removal of plaintiff's addition. According to defendants, the court failed to find that plaintiff *reasonably* relied upon Mrs. Neel's statements in going forward with his addition. See *Mann*, 2004 VT 100, ¶ 27 (listing elements of equitable estoppel). Defendants also argue that (1) there is no evidence that the Association considered plaintiff's continued work on the addition to be a nonissue

at the conclusion of the board hearing; (2) the minutes of the board hearing did not accurately reflect Mrs. Neel's comments at the hearing; and (3) the Association's failure to sue plaintiff upon commencement of his construction cannot be construed as acquiescence.

¶ 18. We find these arguments unavailing. As defendants acknowledged, although the superior court did not expressly rely on the doctrine of equitable estoppel, its decision appears to be based, at least in part, on principles underlying that doctrine. Essentially, the court concluded that, given (1) defendants' statements indicating that they were amenable to relocating the easement as long as their rights were fully protected, (2) the relatively minimal encroachment involved, and (3) the apparent lack of prejudice to defendants in bending the easement around plaintiff's addition, the most appropriate remedy would be to require plaintiff to relocate the easement rather than tear down his addition.

¶ 19. The court's decision is supported by the law set forth above and by the evidence presented. See *id.* ¶ 28 (trial court determines credibility of witnesses and persuasiveness of evidence). Throughout the legal proceedings, the Neels have been the driving force behind the Association's challenge to plaintiff's encroachment on the easement. Mrs. Neel's statements at the board hearing, in the presence of the Association's attorney, led plaintiff to believe that he could build the addition as long as he could provide the Association with a comparable alternative easement. Indeed, Mrs. Neel informed the board that she had suggested to plaintiff that he could finish his addition if he agreed to give the Association legal title to a comparable relocated right-of-way that bent around his house.[2] For reasons that are not entirely clear, plaintiff did not accept the proposal.

¶ 20. Nevertheless, based upon the statements made at the board hearing, plaintiff assumed that he could go forward with his addition because, at minimum, the Association would allow him to bend the easement around his addition. The superior court's decision suggests that, under the circumstances, plaintiff's belief was reason-

---

[2] In their brief on appeal, defendants state that Mrs. Neel was willing to recommend to her partners an alternative that "would have entailed deeding the minimum detour necessary for the Access Road to bend around the proposed footprint of the addition pending further discussions about a permanent solution." Even at oral argument before this Court, defendants' attorney conceded that defendants could "live with" the trial court's ruling allowing plaintiff to bend the easement around his addition.

able, even if incorrect. Indeed, instead of requiring plaintiff to remove his addition, the superior court ordered him to provide a survey of a right-of-way "constructed consistent with the existing roadway" that bends around his house at a distance not to exceed fifty feet. We conclude that, given the particular facts of this case, the court did not err by allowing plaintiff to bend the deeded easement around his house rather than tear his addition down. Cf. *Vossen v. Forrester*, 963 P.2d 157, 162 (Or. Ct. App. 1998) (requiring removal of encroaching structure was "not a proper remedy" where encroachment was minimal, easement owner permitted defendant to proceed with construction, and weighing of hardships favored servient landowner).

## II.

■ ¶ 21. Although we uphold the superior court's order allowing plaintiff to bend the easement around his addition, we decline plaintiff's request on cross-appeal for this Court to hold that a servient landowner, with court approval, may unilaterally relocate an easement without obtaining the consent of the dominant owner. Plaintiff seeks a new rule of law based on § 4.8 of the Restatement (Third) of Property: Servitudes (2000). Section 4.8(3) of the Restatement provides as follows:

> Unless expressly denied by the terms of an easement, as defined in § 1.2, the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not
>
> (a) significantly lessen the utility of the easement,
>
> (b) increase the burdens on the owner of the easement in its use and enjoyment, or
>
> (c) frustrate the purpose for which the easement was created.

*Id.* § 4.8(3), at 559.

¶ 22. The drafters of the Restatement acknowledged that this section rejects the rule espoused by most jurisdictions in this country, including Vermont, see *In re Shantee Point*, 174 Vt. at 261, 811 A.2d at 1254; *Sargent*, 121 Vt. at 12, 147 A.2d at 900, that the servient landowner may not unilaterally relocate an easement.

Restatement (Third) of Property: Servitudes § 4.8 cmt. f, at 563. Instead, the drafters adopted "the civil-law rule that is in effect in Louisiana and a few other states." *Id.* As the drafters explain, "[t]he primary purpose of the rule is to increase the value of the servient estate by limiting the easement's potential to prevent development even when a relocated easement would equally well serve the interests of the easement holder." *Id.* at 564.

¶ 23. A few courts have adopted § 4.8 because its flexible approach prevents intransigent easement holders from unnecessarily thwarting development of the servient estate. See, e.g., *Roaring Fork Club, L.P. v. St. Jude's Co.*, 36 P.3d 1229, 1237 (Colo. 2001) ("[E]ach property owner ought to be able to make the fullest use of his or her property allowed by law, subject only to the requirement that he or she not damage other vested rights holders."); *M.P.M. Builders, LLC v. Dwyer*, 809 N.E.2d 1053, 1057 (Mass. 2004) (Restatement approach "strikes an appropriate balance between the interests of the respective estate owners by permitting the servient owner to develop his land without unreasonably interfering with the easement holder's rights"); *Lewis v. Young*, 705 N.E.2d 649, 653-54 (N.Y. 1998) ("consonant with the beneficial use and development of its property," servient landowner can move undefined right-of-way so long as new location does not frustrate parties' intent in creating right-of-way or increase burden on right-of-way's owner); cf. *Goodwin v. Johnson*, 591 S.E.2d 34, 38 (S.C. Ct. App. 2003) (court may relocate easement of necessity when evidence supports such relocation).

¶ 24. On the other hand, the traditional approach — which effectively requires servient landowners to purchase, or obtain by consent, the right to relocate a legally established right-of-way — "favors uniformity, stability, predictability and property rights." *MacMeekin v. Low Income Hous. Inst.*, 45 P.3d 570, 579 (Wash. Ct. App. 2002) (declining to adopt Restatement approach). As the Georgia Supreme Court explained in rejecting the Restatement approach, the traditional rule

> provides certainty in land ownership. Allowing unilateral avoidance of the contract by the owner of the servient estate not only would violate fairness principles, it also would create uncertainty in real property law by opening the door for increased litigation over "reasonableness" issues based on today's conditions rather than those considered in the original bargain. No doubt, when the servitude was first created both parties considered all market factors, including their respec-

tive costs and benefits, before agreeing on the consideration for the transaction. If the benefits of relocation become substantial enough, it is the market that should ultimately bring the parties together again, not the courts.

*Herren v. Pettengill*, 538 S.E.2d 735, 736 (Ga. 2000). Along the same lines, the Supreme Judicial Court of Maine explained that permitting unilateral relocation of easements

would definitely introduce considerable uncertainty into land ownership, as well as upon the real estate market, and serve to proliferate litigation .... Indeed, the owner of the dominant estate would be deprived of the present security of his property rights in the servient estate and could be subjected to harassment by the servient owner's attempts at relocation to serve his own conveniences. A unilateral relocation rule could confer an economic windfall on the servient owner, who presumably purchased the land at a price which reflected the restraints existing on the property. Such a rule would relieve him of such restraints to the detriment of the owner of the dominant estate whose settled expectations would be derailed with impunity.

*Davis v. Bruk*, 411 A.2d 660, 665 (Me. 1980).

¶ 25. We find these arguments persuasive. Although there are legitimate arguments in favor of adopting the Restatement approach, the potential negatives of doing so demand caution before abandoning our established law foreclosing unilateral relocation of established easements. Accordingly, we reject plaintiff's argument on cross-appeal that we should remand the matter for the trial court to apply the Restatement approach to require defendants to use the alternative road he constructed.

### III.

¶ 26. Next, defendants argue that the superior court erred by issuing an advisory opinion regarding the burden that might be imposed on plaintiff as the result of hypothetical future development of the Association's property. We agree that the court acted prematurely in limiting defendants' rights to use the easement for potential future development of the dominant estate.

¶ 27. After finding that the Association members intended to use the Kimibakw property for family recreational purposes rather than develop it, the court concluded that developing the property now

would unduly burden the servient estate. Consequently, the court ruled that the scope of the easement does not include the right to use it as an avenue for future development.[3] The court made this ruling even though there was no controversy concerning future development. No development was planned, and neither party sought to limit the scope of the easement with respect to any future development.[4]

¶ 28. Under these circumstances, the superior court's ruling that the scope of the easement does not include its use as an avenue for future development is an impermissible advisory opinion. "For a court to make a declaratory judgment, it must have before it an actual or justiciable controversy." *Mass. Mun. Wholesale Elec. Co. v. State*, 161 Vt. 346, 363, 639 A.2d 995, 1006 (1994). Thus, declaratory relief is available only when a party is threatened with "actual injury to a protected legal interest." *Id.* The claimed consequences of the controversy must be reasonably expected rather than based on fear or anticipation. *Id.* Here, the trial court should have refrained from ruling on the scope of the easement as to any future development because there was no actual controversy with respect to that issue. Accordingly, we strike from the court's decision both that ruling and the findings in support of that ruling.

## IV.

¶ 29. Finally, we reject defendants' remaining arguments concerning the court (1) allowing plaintiff to maintain a permanent locked gate at the entrance to the easement; (2) finding that utility poles erected by plaintiff's predecessors-in-title were outside the easement; (3) concluding that a boulder placed across the upper fork of the easement did not unreasonably burden defendants; and (4) suggesting that defendants used the easement in an unreasonable manner by damaging flowers alongside the easement. Regarding the first issue, defendants make a general argument concerning the

---

[3] The superior court also ruled that Association members could not use the easement to access any property other than the Kimibakw parcel. Defendants have not challenged that aspect of the court's ruling, which was not advisory in nature.

[4] While plaintiff's complaint sought a declaratory judgment establishing the specific scope of the easement, that request went to the type of traffic allowed, and the court determined in its June 6, 2001 decision that "the scope of permissible use includes pedestrians and vehicles of the kind ordinarily permitted on unpaved public roads in Vermont such as may be reasonably necessary to access the dominant estate."

erection of gates, without explaining the significance of a locked gate under the circumstances of this case. The evidence at trial showed that there had been a gate at the entrance of the easement for decades. Defendants failed to convince the court that a gate would unjustifiably burden access to their property. The court determined that a locked gate would be reasonable as long as plaintiff provided access to Association members, their guests, and emergency vehicles. We find no abuse of discretion. See *Lovitt v. Robideaux*, 78 P.3d 389, 395 (Idaho 2003) (servient owner may erect gate to restrict use of easement to rightful users, as long as gate does not unreasonably burden dominant owner); *Rupert v. Gunter*, 640 P.2d 36, 39 (Wash. Ct. App. 1982) (whether servient owner may maintain gate across easement depends on intention of parties creating easement, as shown by circumstances of case, situation of property, and manner in which easement has been used).

¶ 30. Regarding the telephone poles, the superior court found that, after consulting with Mrs. Bernhard (plaintiff's predecessor-in-title), Mrs. Neel determined that the utility poles would be placed outside of the right-of-way, and that placement of the poles would not affect use of the easement. At trial, Mrs. Bernhard testified that after Mrs. Neel wrote her a letter expressing concern about the location of the poles, she consulted an attorney, who told her that as long as the poles were staggered and more than fifty feet apart they would not interfere with the right-of-way because of its indefinite center line. Mrs. Bernhard further testified that Mrs. Neel accepted this explanation. Thus, the court's challenged findings are supported by this testimony.

¶ 31. Regarding the alleged obstruction, the trial court found that the only obstruction plaintiff had erected was a boulder on the upper fork of the easement to protect grass-covered ski trails. The court noted that the boulder had been removed and determined that no damage award was warranted. We find no abuse of discretion. Nor do we find any reversible error in the court suggesting that the destruction of flowers along the right-of-way could be considered an unreasonable use of the easement but finding a lack of evidence as to the amount of damages.

*The superior court's April 15, 2004 decision is affirmed in all respects, except that its restriction on using the easement as an avenue for future development and its accompanying findings on that issue are stricken from the decision.*