2013 VT 100A

# David E. Roy, Mary R. Roy, Michael Hirschbuhl, Tonia Hirschbuhl, Richard Roy, Roberta Roy, Glenn Barr, et al. v. Woodstock Community Trust, Inc.

[94 A.3d 530]

No. 11-265

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed January 17, 2014

428

*Kaveh S. Shahi* of *Cleary Shahi & Aicher, P.C.*, Rutland, for Plaintiffs-Appellants/Cross-Appellees.

*Robert S. DiPalma* and *Kristina M. Roomet* of *Paul Frank + Collins P.C.*, Burlington, for Defendant-Appellee/Cross-Appellant.

¶ 1. **Dooley, J.** This case arises out of a proposed housing development in West Woodstock, Vermont. It is not the first case to come before us related to this development. In *In re Woodstock Community Trust & Housing Vermont PRD*, 2012 VT 87, 192 Vt. 474, 60 A.3d 686, we affirmed the permits for the project granted by the town development review board and the district environmental commission and affirmed by the Environmental Division of the superior court. This appeal, brought by the owners of abutting properties to the land in question — David and Mary Roy, Michael and Tonia Hirschbuhl, Richard and Roberta Roy, Glenn and Charlotte Barr, Richard and Shirley Burroughs, and Jay Smith — presents a number of more narrow questions related to easements and other property rights. It also includes a cross-appeal by Woodstock Community Trust, Inc. (WCT) of a finding of the superior court related to those same property rights. We affirm in part and reverse in part.

¶ 2. The property in question consists of two abutting parcels located along Route 4 in West Woodstock. One of the parcels is a half-acre lot with a building on it, known as the Grange Hall ("parcel 1"), and the other a 7.5-acre parcel that contains no building but includes a parking lot as well as the driveway that provides access to the property from Route 4 ("parcel 2").

¶ 3. WCT is a nonprofit corporation; part of its mission is to promote affordable housing within Woodstock. It purchased both of these parcels in 2005. It took. title subject to three water easements that run across the property, owned by plaintiffs Shirley and Richard Burroughs, Roberta and Richard Roy, and Jay Smith. Smith also maintains that he owns spring rights on the property.

¶ 4. Plaintiffs brought this case in 2007, while the project was still under review for permitting approval, alleging a wide variety of property-right violations. The trial court dismissed one claim, decided others on partial summary judgment, and sent the

remaining claims to trial. During the course of the jury trial, the court granted a number of Vermont Rule of Civil Procedure 50 motions for judgment as a matter of law, leaving only one question for the jury: whether the proposed project unreasonably interfered with Smith's spring rights — rights that the court had found, after the close of evidence at trial, to exist as a matter of law.

¶ 5. In May 2011, the jury found for Smith, and a judgment was entered in July 2011. After the trial, both parties submitted proposed judgment orders. WCT requested an evidentiary hearing, but the hearing did not take place because plaintiffs filed a letter with the trial court requesting the prompt issuance of a final judgment order sufficient to allow Smith and the other plaintiffs to appeal. The trial court, in its words, "[i]nterpret[ed] this to mean that plaintiff was no longer pursuing injunctive relief, . . . [and] issued a final judgment order stating simply that the proposed development unreasonably interfered with plaintiff's spring rights."

¶ 6. After plaintiffs filed their appeal in this Court, WCT filed a renewed motion for judgment as a matter of law together with a motion to alter or amend the judgment or for new trial and obtained a remand order from this Court authorizing review by the trial court of those motions. The trial court held an evidentiary hearing on the motions in November 2011 and considered WCT's proposal to modify its plans and found that the project as modified no longer interfered with Smith's spring rights. It therefore issued an amended judgment order on December 30, 2011, ordering WCT to lay a polyethylene sleeve and pipe on its property to allow Smith access to his spring rights, calling this "an appropriate equitable remedy for the interference that was found by the jury."

¶ 7. On appeal, plaintiffs argue that: (1) the trial court lacked jurisdiction post-judgment to hold an evidentiary hearing about interference with Smith's spring rights; (2) Smith was denied his right to a jury trial in that evidentiary hearing; (3) the equitable remedy that resulted from that hearing was a de facto overturning of the jury verdict; (4) Smith was entitled to injunctive relief as well as declaratory relief as a result of the jury verdict; (5) the trial court erred by allowing, on summary judgment, the unilateral

relocation of the Roys'[1] and Burroughs' water easements; (6) the trial court erred by denying, on summary judgment, adverse possession claims by David Roy and the Hirschbuhls; (7) the trial court erred by denying, also on summary judgment, boundary-by-acquiescence claims by the Roys and Hirschbuhls; (8) the jury should have been allowed to decide if the new use of an easement belonging to WCT on David Roy's property exceeded the original easement as granted to its predecessor; and (9) the trial judge erred in dismissing plaintiffs' nuisance claims. WCT, for its part, cross-appeals the trial court's finding as a matter of law that Smith possessed a current spring right on WCT's property.

¶ 8. Further facts related to the history and geography of the properties will be presented as necessary in the sections below. Our treatment of the various issues is not chronological with respect to when the appealed decisions were made, but rather commences with the cross-appeal and then tracks the order in which plaintiffs present their claims of error in their brief.

¶ 9. We begin with WCT's cross-appeal regarding Smith's purported "spring rights." After plaintiffs' case, WCT made a motion for judgment as a matter of law that Smith had no spring rights on WCT's property. See V.R.C.P. 50(a). The court denied the motion, and counsel for WCT renewed it after the close of evidence. At that time, counsel for plaintiffs made his own Rule 50 motion for judgment as a matter of law that Smith *did* have spring rights. The trial court ruled for plaintiffs, granting their Rule 50 motion on this issue and denying WCT's Rule 50 motion. After entry of judgment, WCT properly filed a renewed motion for judgment as a matter of law, preserving its right to appeal the denial of its motion. See V.R.C.P. 50(b). It filed a cross-appeal appealing the denial of its Rule 50 motion.

¶ 10. Rule 50 explains:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that

---

[1] As there are multiple parties who have the surname of Roy, we will use "David Roy" to refer to David Roy and "the Roys" to Richard and Roberta Roy. None of the claims of error relate specifically to Mary Roy.

cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

V.R.C.P. 50(a)(1). We review judgments as a matter of law under the same standard as the trial court: evidence is viewed in the light most favorable to the nonmoving party, excluding the effects of any modifying evidence. *Gero v. J.W.J. Realty*, 171 Vt. 57, 59, 757 A.2d 475, 476 (2000). When the appeal is of a denial of a motion for judgment as a matter of law, the trial court's ruling will be upheld if any evidence fairly or reasonably supports a lawful theory of the nonmoving party. *Northshire Commc'ns, Inc. v. AIU Ins. Co.*, 174 Vt. 295, 298, 811 A.2d 216, 219-20 (2002). Under these standards, we reverse the superior court decision. Not only do we find that the court erred in granting plaintiffs' motion, we find that it erred in denying WCT's motion because there is no legally sufficient evidentiary basis to find that Smith has spring rights on WCT's property.

¶ 11. The trial court made its determination that Smith has spring rights based on his testimony at trial, as well as documentary evidence of deeds demonstrating the chain of title to the property. The trial court concluded that the spring rights were appurtenant to the land conveyed to plaintiff through a chain of title tracing back to 1915.[2] In its oral decision, the trial court did not explain its conclusion beyond stating, "I do think, as a matter of law, that he has established that the — the appurtenant easement in question attaches to his property and he has a spring right and I'm prepared to instruct the jury to that effect . . . ." In earlier comments, however, the court alluded to its reasoning, citing a case where this Court found that a warranty deed that referenced "appurtenances" in the deed included spring rights. *Sargent v. Gagne*, 121 Vt. 1, 4, 147 A.2d 892, 895 (1958).

¶ 12. In evaluating WCT's appeal, we consider undisputed evidence of record concerning the chain of title to the land now

---

[2] The location of this spring relative to the WCT property today is unclear. Smith testified al trial that he had been over onto the property soon after he purchased his land to try to find the spring but that he had not found a spring, any water coming out of the ground, a reservoir, aqueduct or pipes — merely a "wet spot." Smith conceded, however, that he did not know whether the wet spot was caused by water coming up out of the ground or water running off the hill at the back of the property. Roy also testified to a "wetland," but no spring or structure. There was also a survey map introduced by counsel for WCT that had a reference to a blind spring.

owned by Smith, and to the spring rights asserted by Smith. There is no dispute that Smith can trace title to the land he and his then-wife purchased in 2000 back to a March 1915 deed from Mary Vaughan to F. Guy Smith and Ida Smith (no relation to plaintiff Smith). That March 1915 deed mentioned neither a spring nor spring rights. The property conveyed by that March 1915 deed passed through the estate of Ida Smith, who survived her husband. Citing the correct book and page reference, the 1938 decree of distribution from Ida Smith's estate conveyed to Allen Barrett and Mary Anne Shaw the property referenced in the March 1915 deed. In 1955, Barrett and Mary Anne Shaw Galloway and their spouses conveyed the property to Annie L. Kenefick, and plaintiff Smith ultimately acquired the property through a documented chain of transfers thereafter.

¶ 13. ▮ However, the spring rights did not arise from the March 1915 deed for the property now owned by plaintiff Smith. Rather, the spring rights were conveyed as part of title to the distinct plot of land on which the spring actually sits. The pertinent warranty deed, from Charles W. Smith to F. Guy Smith with a November date, provides as follows:

> I . . . do freely give, grant, sell, convey and confirm unto the said F. Guy Smith and his heirs and assigns forever, a certain piece of land and Spring in Woodstock in the County of Windsor and State of Vermont, described as follows, viz: A Spring and the water thereof and therein, located at the foot of the hill on the Grantor's Meadow in West Woodstock eight (8) feet westerly of the division fence between land of the Grantor and land of Marble and Southerly of and opposite to a point in said Marble's part of said fence twenty one (21) feet Northerly of the point of the division of said fence, together with the sufficient land around said Spring as may be necessary to use in preserving, maintaining and repairing the well or reservoir, now built around said Spring, and the right to maintain, repair, and relay when necessary the aqueduct or pipe now laid through the land of the Grantor from said Spring to premises of the said F. Guy Smith, doing no unnecessary damage and paying for such unavoidable damage as may be occasioned in repairing and maintaining said well or reservoir and water pipe therefrom —

Also the right in case said Spring should hereafter fail to supply as much water as it now does, to take, dig out, and fit up with a proper well or reservoir about the same, and connect with the first above described Spring and aqueduct and other Spring in the vicinity of said first mentioned Spring, with the same right to improve, maintain and use the same in all respect[s] as granted with the Spring first above mentioned.

Plaintiff has failed to demonstrate that he is successor to a chain of title to this land — the spring itself — to which the spring "rights" are appurtenant.[3]

¶ 14. ▮ Plaintiff appears to rely on the 1955 deed from Allen Barrett and Mary Anne Shaw Galloway, along with their spouses, conveying the property referenced in the March 1915 deed to Annie L. Kenefick. That deed, which is squarely in plaintiff's chain of title, references the November 1915 warranty deed and purports to convey spring rights stemming from that deed. The problem is that there is no evidence that Barrett and Shaw Galloway succeeded to title of the land conveyed in the November 1915 deed or otherwise owned the spring or rights to access the spring. The only evidence of any conveyance to Barrett and Shaw Galloway is the 1938 decree of distribution from the estate of Ida Smith. That decree refers, by explicit description and correct book and page numbers, only to the land conveyed by the March 1915 deed. That order does not purport to decree to Barrett and Shaw Galloway a separate parcel including the spring, or spring rights to the waters of such a spring. "Land does not pass as a mere appurtenance to other land; and, consequently, no portion of the highway, or stream, will be conveyed, unless the instrument of conveyance can, by reasonable construction, be made to include it." *Cole v. Haynes*, 22 Vt. 588, 590 (1849).

---

[3] For purposes of this appeal, we need not determine the course of title to the land conveyed in the November 1915 deed; plaintiff Smith bore the burden of providing evidence that he succeeded to that title. Insofar as the spring rights were part of a separate conveyance of land, plaintiff Smith must demonstrate that he is a successor to a chain of title to the spring land, as opposed to the adjacent land conveyed through the March 1915 deed. Conversely, to find as a matter of law that plaintiff Smith does *not* own the spring rights, we need find only one conveyance where there is no "legally sufficient evidentiary basis for a reasonable jury" to find that rights were successfully transferred. V.R.C.P. 50(a)(1).

¶ 15. Because we find that Smith has no spring rights in the property now owned by WCT, we need not evaluate his claims of error related to the post-judgment hearing, and the injunction issued by the trial court.

¶ 16. Next, we turn to plaintiffs' claim that the trial court erred by granting to WCT, on summary judgment, the right to unilaterally relocate two sets of plaintiffs' water casements. The trial court made this ruling in a written order on October 6, 2010, prior to trial, noting that no facts related to the question were in dispute. Our review is de novo. See *RLI Ins. Co. v. Agency of Transp.*, 171 Vt. 553, 554, 762 A.2d 475, 477 (2000) (mem.).

¶ 17. The following is the background to this question. Two sets of neighbors — the Burroughs and the Roys — have water-line easements that cross WCT's property underground. The water line easements provide the families with water from the water main running along Route 4. As WCT's project has been designed and permitted, the water-line easements will prevent parts of the development. WCT sought an order from the trial court permitting relocation of the easements and the water lines within them to the southern and eastern edges of its property so that they would not interfere with construction. It represented that the relocation would neither inconvenience the neighbors nor affect the delivery of water to their homes after a brief interruption in service during the relocation of the pipes. It offered to pay all costs of relocation and to provide the neighbors with bottled water until service is restored.

¶ 18. Both the Burroughs and the Roys objected to the WCT proposal. They maintain that they need access to the waterline for repairs and maintenance and are concerned that the greater length of pipe in the new location will impose a higher maintenance cost on them. The Burroughs also expressed concern that the new waterline location would cross the location of Smith's spring right and would interfere with the root system of the trees and other vegetation along the easterly edge of WCT's property, exposing them to litigation. The trial court granted WCT's motion for summary judgment, but noted that "[a] cause of action might, of course, arise in the future if defendant's performance falls below the promises it has made in this action and during the permitting process."

¶ 19. Plaintiffs argue that the trial court holding is directly contrary to this Court's decision in *Sweezey v. Neel*, 2006 VT 38,

179 Vt. 507, 964 A.2d 1050. In that case, we reaffirmed the traditional common-law rule that the owner of a servient estate may not change the location of a right-of-way without the consent of the easement owner. *Id.* ¶¶ 21-25; see also *Sargent,* 121 Vt. at 12, 147 A.2d at 900 ("It is the general rule that a way, once located, cannot be changed thereafter without the mutual consent of the owners of the dominant and servient estates.").

¶ 20. ▮ In *Sweezey,* we expressly rejected the Restatement (Third) of Property: Servitudes § 4.8(3) (2000) approach to unilateral relocation of easements. That section provides:

> Unless expressly denied by the terms of an easement, as defined in § 1.2, the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not
>
> > (a) significantly lessen the utility of the easement,
> >
> > (b) increase the burdens on the owner of the easement in its use and enjoyment, or
> >
> > (c) frustrate the purpose for which the easement was created.

*Id.* Plaintiffs maintain that *Sweezey* is indistinguishable from the present case, and the Restatement approach is therefore inappropriate.

¶ 21. We disagree. As the trial court correctly pointed out, *Sweezey* involved a surface easement. The analysis was based on the presumption that the landowners that set out the easement had considered the factors of ease of access and the impact of the right-of-way on other uses of the servient property, and sought to protect that agreement from future unilateral changes. *Sweezey,* 2006 VT 38, ¶¶ 2-6, 24 (describing the attributes of the easement in detail and explaining the justification for the traditional rule in the following terms: " 'No doubt, when the servitude was first created both parties considered all market factors, including their respective costs and benefits, before agreeing on the consideration for the transaction.' " (quoting *Herren v. Pettengill,* 538 S.E.2d 735, 736 (Ga. 2000))). We noted: "Although there are legitimate arguments in favor of adopting the Restatement approach, the

potential negatives of doing so demand caution before abandoning our established law foreclosing unilateral relocation of established easements." *Id.* ¶ 25.

¶ 22. We reiterate that we do not wish to "abandon[ ] our established law" for surface easements. This case, however, presents an opportunity to evaluate whether a rule adopted for surface easements should be extended to subsurface easements. The trial court concluded that if water pipes in an alternative route delivered proper water pressure and did not increase the difficulty and expense of maintenance, there was no reason to prevent the relocation. It noted that WCT provided expert testimony in support of its position, but plaintiffs offered only speculative objections. We concur in the superior court's analysis.

¶ 23. ▮ In reviewing the superior court's analysis, we note that *Sweezey* does not stand for the extreme position that plaintiffs claim. We observed that "[c]ontrary to enforcing restrictive covenants, locating easements often allows some flexibility in terms of creating a remedy that is satisfactory to all parties," and that "when the servient estate encroaches upon the easement, the trial court is not necessarily confined to requiring the removal of the encroaching structure irrespective of the extent or impact of the encroachment." *Sweezey*, 2006 VT 38, ¶ 12 (citation omitted). In that very case, we found that the superior court had properly allowed the plaintiff to bend the defendants' easement to avoid having to move a permanent structure that encroached a few meters onto the original easement. *Id.* ¶ 13. We recognize that the flexibility allowed in *Sweezey* would not allow the easement relocation here if the rule for subsurface easements were identical to that for surface easements.[4] Nevertheless, we are influenced by *Sweezey*'s recognition that a result that meets the needs of both the owner of the dominant estate and the owner of the servient estate is desirable.

¶ 24. ▮ *Sweezey* relied upon two main factors in rejecting the Restatement approach. Relying on cases from other jurisdictions, we concluded that allowing relocation would upset the economic balance involved in the negotiation of an established easement location. *Id.* ¶ 24. Second, we concluded that unilateral easement

---

[4] One of the factors the *Sweezey* Court relied upon was acquiescence by the owners of the dominant estate to bending the easement, *Id.* ¶ 18. There is no such acquiescence here.

relocation would introduce uncertainty into land ownership and generate litigation, *Id.* Both considerations are far less important for subsurface easements, where the location is relatively unimportant as long as the purpose of the easement is satisfied. It is much less likely that the parties bargained over the path of a water easement with respect to price. Nor is it likely that there would have to be litigation to determine the new path of the easement. On the other hand, there is a significant likelihood that an objection to a subsurface easement would be used to stop development and not to ensure that the purpose of the easement is fulfilled. In the underground-casement context, we agree with the Supreme Judicial Court of Massachusetts that the Restatement approach "strikes an appropriate balance between the interests of the respective estate owners by permitting the servient owner to develop his land without unreasonably interfering with the easement holder's rights." *M.P.M. Builders, LLC v. Dwyer*, 809 N.E.2d 1053, 1057 (Mass. 2004).[5] For these reasons, we adopt the Restatement (Third) of Property: Servitudes § 4.8(3) approach for underground easements. Of course, an agreement to relocate, with a determination of the relocation path, is always an effective and preferred approach.

¶ 25. In adopting a distinction based on the nature of the easement, we note that other courts have done so before us. See, e.g., *R&S Invs. v. Auto Auctions, Ltd.*, 725 N.W.2d 871, 881 (Neb. Ct. App. 2006) ("Given the nature of the easement in question and the uncertain continued viability of the old lagoon, . . . the district court did not err in applying the Restatement . . . in resolving this case . . . ."); *Texon, Inc. v. Holyoke Mach. Co.*, 394 N.E.2d 976, 978 (Mass. App. Ct. 1979) ("Texon must bear the expense of relocating the steam and electrical conduits so that Holyoke's benefits from its easement will be unaltered by the change in Texon's use of its land.").

¶ 26. ■ In making the distinction between above-ground right-of-way easements and underground easements, we follow somewhat in the footsteps of Colorado. In *Roaring Fork Club, L.P. v. St. Jude's Co.*, 36 P.3d 1229 (Colo. 2001), the Supreme Court of Colorado faced a situation where a servient estate owner replaced an irrigation ditch — providing water passage over its land

---

[5] We have taken this statement from the Massachusetts court, recognizing that it found this logic to hold true for all easements, not just underground easements.

pursuant to an easement — to an underground pipe, but the easement owner did not suffer any diminution of water provided. The trial court had allowed the servient estate owner to make the changes, but required it to assume responsibility for maintenance. The Supreme Court noted the traditional rule that "in the absence of contrary statutes, the location of an easement when once established cannot be changed by either party without the other's consent." *Id.* at 1233 (quotation omitted). However, noting the "clear[ ] . . . distinctions" between ditch easements and other types of easements, *id.*, the Supreme Court held that "the owner of property burdened by a ditch easement [may not] move or alter that easement" unless that owner has the consent of the owner of the easement or unless that owner first obtains a declaratory determination from a court that the proposed changes will "not significantly lessen the utility of the easement, increase the burdens on the owner of the easement, or frustrate the purpose for which the easement was created." *Id.* at 1239. In partially following the Colorado approach, we note that a trial court, faced with an action by the owner of the dominant estate, has the discretion to order the owner of the servient estate to take over maintenance of the underground easement, as well as any other appropriate "allocation of costs and burdens of maintenance that might form part of equitable relief." *Id.*

¶ 27. ■ The trial court's decision on partial summary judgment allowing unilateral relocation of the two water easements is affirmed. In doing so, we also affirm its observation that if WCT's representations as to the equivalence of the new path and pipes should not hold true, plaintiffs may return to the superior court for appropriate relief.

¶ 28. We now turn to David Roy's and the Hirschbuhls' adverse possession claims. The trial court denied these claims on summary judgment in October 2009 because it found that the period necessary for adverse possession had not yet run. We review a summary judgment order using the same standard as the trial court. *Vt. Small Bus. Dev. Corp. v Fifth Son Corp.*, 2013 VT 7, ¶ 12, 193 Vt. 185, 67 A.3d 241.

¶ 29. ■ To prevail on a claim of adverse possession in Vermont, the adverse possessor must show that he or she has used or possessed disputed property in an open, notorious, hostile, and continuous manner throughout the limitations period of fifteen

years. 12 V.S.A. § 501; *First Congregational Church of Enosburg v. Manley*, 2008 VT 9, ¶ 13, 183 Vt. 574, 946 A.2d 830 (mem.).

¶ 30. David Roy contends that he adversely possessed a strip of land eighteen feet wide along the easterly edge of the driveway into the WCT development area, and the Hirschbuhls contend that they and their predecessors adversely possessed a strip of land fourteen feet wide along the edge of the same driveway, as well as a strip twenty feet wide along the back border of their property, which is adjacent to the church parking area. All of the claims are based on activities such as landscaping, planting bushes, and maintaining a lawn, which the plaintiffs assert they had been doing for a time period in excess of fifteen years. The facts related to the actions of plaintiffs are not disputed.

¶ 31. No claims for adverse possession may be asserted, however, against "lands given, granted, sequestered or appropriated to a public, pious or charitable use, or to lands belonging to the state." 12 V.S.A. § 462. As the parcels had been owned from 1981 to 2005 by a church, the trial court found that the time for determining adverse possession could not include the time in which the property was owned by the church and, therefore, commenced in 2005. As a result, it held that plaintiffs' adverse possession had not occurred for fifteen years and granted summary judgment denying that claim.

¶ 32. Plaintiffs appeal this decision for three reasons. First, plaintiffs argue that reliance on 12 V.S.A. § 462 was waived because WCT did not raise it as an affirmative defense in its answer. Second, they claim that — assuming that both parcels met the definition of public, pious or charitable use — WCT cannot now avail itself of that defense as it is a private owner. Finally, they dispute that parcel 2 was property dedicated to public, pious or charitable use, and argue that § 462 does not, therefore, apply to that property.

¶ 33. We begin with plaintiffs' argument that WCT waived the protection of 12 V.S.A. § 462 by not raising it in its answer. Plaintiffs made their adverse possession claims in counts II and III of their complaint. In its answer, WCT merely wrote "Denied" as to the assertions. It did not mention 12 V.S.A. § 462 at that time, but then relied on it heavily in its motion for summary judgment, which was granted and forms the basis of this appeal.

¶ 34. Plaintiffs argue, somewhat confusingly, both that WCT did not raise "the defense of statute of limitations," and that 12 V.S.A.

§ 462 "is an affirmative defense" — apparently, an affirmative defense that is separate from the statute of limitations. We address both versions of the argument.

¶ 35. ■ ■ First, a note about the terms involved in this analysis. The terms "defense" and "statute of limitations" are confusing in this context because of the particular structure of a claim for adverse possession. Adverse possession is a common law cause of action, see *Fraley v. Minger*, 829 N.E.2d 476, 483-84 (Ind. 2005) (discussing history of "common law doctrine of adverse possession," and finding roots as far back as "Code of Hammurabi" in 2250 B.C.), and is not specifically controlled by Vermont statute, except in the sense that such an action can be brought only after the statute of limitations for the recovery of land has run.[6] 12 V.S.A. § 501. Once the prescriptive period has run, the adverse possessor acquires title "as perfect as acquisition by grant." *Montgomery v. Branon*, 127 Vt. 83, 89-90, 238 A.2d 650, 655 (1968). Thus, an adverse possession claim is really one for recognition of title and enforcement of the rights that accompany title. Unless raised by another adverse possessor, the statute of limitations does not create a defense to an adverse possession claim. Plaintiffs have it entirely backwards when they state that WCT's answer "did not raise the defense of statute of limitations."

¶ 36. ■ Plaintiffs' alternative characterization of 12 V.S.A. § 462 is as providing an independent affirmative defense of another sort that must be pled or else waived. V.R.C.P. 8(c); see *Herrera v. Union No. 39 Sch. Dist.*, 2006 VT 83, ¶ 19, 181 Vt. 198, 917 A.2d 923 ("The statute of limitations *and other avoidance defenses* must be pled as affirmative defenses, or else they are waived." (emphasis added)). Affirmative or avoidance defenses are "those that admit the allegations of the complaint but suggest

---

[6] Some states have created specific adverse possession statutes. See, e.g., *Uhl v. Krupsky*, 294 P.3d 559, 562 (Or. Ct. App. 2013) ("In 1989, the legislature enacted ORS 105.620, codifying the common law . . . ."); Tex. Civ. Prac. & Rem. Code § 16.021 et seq. Others have not, but have used their statutes of limitations on real property, in combination with a common law cause of action, to allow adverse possession claims. See *Gorman v. City of Woodinville*, 283 P.3d 1082, 1085-86 (Wash. 2012) (Madsen, C.J., concurring) (explaining that in Washington, "the doctrine of adverse possession is primarily covered by three statutes of limitation," and concluding that "as it has developed in our state, the doctrine is not entirely a creature of the common law, although that is where its origins lie"). Vermont is a member of the second group of states.

some other reason why there is no right of recovery, [or] those that concern allegations outside of the plaintiff's prima facie case that the defendant therefore cannot raise by a simple denial in the answer." 5 C. Wright et al., Federal Practice and Procedure § 1271, at 585 (3d ed. 2004). In other words, "[g]enerally speaking, affirmative or avoidance defenses are unrelated to the plaintiff's prima facie case." *Mary Kay, Inc. v. Dunlap*, No. 3:12-CV-0029-D, 2012 WL 6625323, at *5 n.4 (N.D. Tex. Dec. 20, 2012).

¶ 37. ▇ Here, 12 V.S.A. § 462 could hardly be more related to plaintiffs' prima facie case. In making out their common-law claim for adverse possession, plaintiffs rely on 12 V.S.A. § 501 for the statutory fifteen-year period, which they have the burden to prove. *Higgins v. Ringwig*, 128 Vt. 534, 538, 267 A.2d 654, 656 (1970) (the "burden of proving adverse possession," including the "statutory period of fifteen years," is on the party asserting the adverse possession claim). Under the application of the statute used by the superior court, § 462 limits the applicability of § 501 with respect to lands that are or have been dedicated to public, pious, or charitable use during the prescriptive period. Its effect is to control what periods the adverse possessor can count in order to show fifteen years of open, notorious, hostile and continuous use or possession. To the extent we would consider it a defense, it is not an affirmative defense, and V.R.C.P. 8(c) imposed no obligation to plead the application of the statute in WCT's answer.

¶ 38. ▇ As neither of the two versions of the argument above are availing, we agree with the trial court's determination that WCT did not waive its argument that § 462 applies and prevents plaintiffs from showing adverse possession for the necessary prescriptive period.

¶ 39. Next, we turn to the effect of 12 V.S.A. § 462 when the land is now owned by a private landowner and no longer dedicated to a "public, pious or charitable use." Plaintiffs argue that in such circumstances the statute has no effect — it prevents an adverse possession claim only when the land is dedicated to a public, pious or charitable use and not thereafter. Thus, they argue that they can reach the fifteen years by including any time in which the land was owned by the church and dedicated to a complying use, but a plaintiff engaged in open, notorious and hostile use or possession such that the church could have sued to prevent the possession or use.

¶ 40. The trial court rejected this argument, interpreting 12 V.S.A. § 462 to mean that "the limitations period for adverse possession claims never begins to run against property" that fits under the exception, so "plaintiffs have not established continuous possession of the property for more than fifteen years." WCT argues for this analysis in this Court.

¶ 41. ■ Although our task here is one of statutory construction, we cannot find that the statute on its face has a plain meaning that resolves the conflict between the approaches. Nevertheless, we agree with the trial court and WCT. We have recently interpreted 12 V.S.A. § 462 to function in exactly the way the trial court described. In *Mahoney v. Tara, LLC*, 2011 VT 3, 189 Vt. 557, 15 A.3d 122 (mem.), we faced a similar situation where the plaintiffs brought an adverse possession claim against a private landowner who had recently acquired land — including the portion that the plaintiffs alleged that they were adversely possessing — from Vermont Catholic Charities, Inc. (VCC). The defendant landowner claimed that VCC used the property for pious or charitable purposes. The trial court dismissed the adverse possession claim based on 12 V.S.A. § 462, and the plaintiffs appealed, arguing that they should have been given an opportunity to establish a claim of adverse possession in the time period before VCC purchased the land in question. Based on the allegations in the complaint, however, the plaintiffs' adverse possession of the land could not have lasted fifteen years counting only years before or after the time that VCC owned the property. We concluded that the "plaintiffs' claim of ownership by adverse possession fails without including some portion of the time period that VCC owned the Tara Lot," and declined to count those years. *Id.* ¶ 8. *Mahoney* necessarily holds that for purposes of an adverse possession claim, the period during which the land falls under the public, pious or charitable use exception of 12 V.S.A. § 462 cannot be counted toward the statutory fifteen-year prescriptive period of 12 V.S.A. § 501, even when the land is no longer in public, pious or charitable use.

¶ 42. ■ We recognize that *Mahoney* contains little analysis of the competing positions on the meaning of the statute. Thus, we have looked to the analysis of the issue in other jurisdictions. In doing so, we note that § 462 treats identically public, pious or charitable uses and "lands belonging to the state." Other states

have a similar exception for lands owned by government for public uses, although generally not including an exception for pious or charitable uses, and have faced the same question. Based on this review, we note that *Mahoney* reflects the majority, if not unanimous, rule from comparable decisions in other jurisdictions. See, e.g., *Loavenbruck v. Rohrbach*, 2002 ME 73, ¶ 14 n.5, 795 A.2d 90 (collecting cases); see generally 16 R. Powell, Powell on Real Property § 91.11[2], at 91-86 (2000) ("Courts have also held that where land was previously owned by the government and is currently held by a private individual and a claimant adversely occupied the land during the entire time, the period of adverse possession against the government is not counted in determining the validity of the claim."). We also note that courts in the one state that has a statute identical to 12 V.S.A. § 462, see Mo. Stat. Ann. § 516.090, have interpreted it to apply as the trial court did here. See *Rice v. Huff*, 22 S.W.3d 774, 781 (Mo. Ct. App. 2000) (applying § 516.090 and holding that "the statute of limitations on an adverse possession claim of a dedicated street only begins to run once a city vacates or discontinues the street"); see also *Przybylski v. Barbosa*, 289 S.W.3d 641, 644 (Mo. Ct. App. 2009) (same).

¶ 43. This conclusion also makes sense given the policy concerns behind § 462. As the Supreme Court of Missouri observed in construing the identical statutory language: "Prior to [the] statute[,] this state had, through its statutes, adopted the policy of allowing limitations to run against the state and municipalities. It was found to be a ruinous public policy, for under it [public lands] were lost . . . through the laches or ignorance of the public or of officials representing it." *Dudley v. Clark*, 164 S.W. 608, 612 (Mo. 1914); see also *Empire Dist. Elec. Co. v. Gaar*, 26 S.W.3d 370, 376 (Mo. Ct. App. 2000). This policy reason was also expressed in the leading case of *Gibson v. Chouteau*, 80 U.S. (13 Wall.) 92, 99 (1871), with respect to public land, which noted that "no laches can be imputed to the king, and . . . he ought not suffer from the negligence of his officers and servants." The statute also favors uses of land protected by it. See *Soc'y for the Propagation of the Gospel v. Town of Pawlet*, 29 U.S. (4 Pet.) 480, 505 (1830) ("The public have a deep and permanent interest in such charities [protected by the predecessor of 12 V.S.A. § 462]; and that interest far outweighs all considerations of mere private convenience."); *Dudley*, 164 S.W. at 612 (stating that "the law favors pious and charitable uses as well as public ones").

¶ 44. Under plaintiffs' theory, although the land can remain in public, charitable or pious use indefinitely, its value can be partially or totally eroded as a result of adverse possession of some or all of it during the time the use qualifies under § 462. If the land moves from public, pious or charitable use, or state ownership, to a use or ownership not protected by § 462, its value will immediately be impaired or eliminated. In this case, for example, the land owned by the church will be greatly reduced in value if the access from Route 4 is so restricted on transfer that development becomes impossible. We do not believe that such a result is consistent with the protective policy of § 462. Indeed, the owner of the land covered by § 462 would have almost the same need to prevent encroachment as if § 462 did not exist.

¶ 45. Because the trial court's reading of § 462 is in line with our precedent, with precedents from other jurisdictions, and with the policy concerns behind the provision, we affirm its conclusion that plaintiffs may not rely on the years during which the church owned the property in question and dedicated it to a public, pious or charitable use to make their adverse possession claims.

¶ 46. Finally, we address plaintiffs' claim that the trial court erred in finding that parcel 2 had been dedicated to "pious and public purposes."[7] The material facts are as follows. Between 1981 and 2005, both parcels were owned by a religious organization known as the Woodstock Baptist Fellowship. later known as The Rock Church. According to affidavits submitted with WCT's motion for summary judgment, the church used the properties for numerous religious activities, including weekly church services and Sunday school programs, as well as bible studies during the week and a youth bible camp during the summer. It occasionally held picnics on the property, and during bible school in the summer, children played games and engaged in activities on the playing field and other portions of the property. The property was also used by the public: the church allowed the public to use the parking lot for Fourth-of-July fireworks, a Boy Scout troop held meetings on the property, and the local middle and high schools used and maintained the fields for sports practices and games. The Woodstock Recreation Center also used the playing field for sports practices and programs.

¶ 47. Plaintiffs did not dispute any of these facts about the use of the property at trial. Instead, they argued that the property

---

[7] Plaintiffs have not argued that § 462 does not apply to parcel 1.

does not qualify under § 462 because its "primary use was [as] a church with a defined, specific membership," and therefore the church did not "use the property for the benefit of an indefinite class of people."[8] In making this argument, plaintiffs relied on our analysis of § 462 in *MacDonough-Webster Lodge No. 26 v. Wells*, 2003 VT 70, 175 Vt. 382, 834 A.2d 25. There we held that the analytic framework for applying the charitable-use exemption from property taxation contained in 32 V.S.A. § 3802(4) also applied to the charitable-use exemption of § 462. This entailed application of the three-part test for "public" use announced in *American Museum of Fly Fishing, Inc. v. Town of Manchester*, 151 Vt. 103, 110, 557 A.2d 900, 904 (1989), and later extended to "charitable" use in, among other decisions, *Institute of Professional Practice v. Town of Berlin*, 174 Vt. 535, 536, 811 A.2d 1238, 1240 (2002) (mem.) (holding that, "[t]o be exempt from property tax as a public or charitable use," the property must meet the *American Museum* test).

¶ 48. The elements of the *American Museum* test are: "(1) the property must be dedicated unconditionally to public use; (2) the primary use must directly benefit an indefinite class of persons who are part of the public, and must also confer a benefit on society as a result of the benefit conferred on the persons directly served; and (3) the property must be owned and operated on a not-for-profit basis." 151 Vt. at 110, 557 A.2d at 904; see also *MacDonough*, 2003 VT 70, ¶ 13. We expanded upon the second prong of the analysis in *Sigler Foundation v. Town of Norwich*, examining the criteria to determine whether a given use of land conferred "a private, as opposed to [a] general, or indefinite benefit." 174 Vt. 129, 134, 807 A.2d 442, 446 (2002). We explained that "[p]ublic uses are characterized as such, in part because of the breadth and scope of the users" while "[p]rivate uses . . . are characterized by the benefits bestowed on a particular" group, and further observed that it is "the character and quality of an organization's 'choice,' 'selection,' or 'judgment' criteria used to determine its beneficiaries that informs the question of whether or not the organization's use of its property benefits an indefinite class that is part of the public and, thus, confers a benefit on society." *Id.* at 134, 807 A.2d at 447.

---

[8] In fact, the affidavits in support of summary judgment filed by WCT did not address whether the church had members or otherwise admitted the public.

¶ 49. Plaintiffs argue that the circumstances here meet none of the prongs of the *American Museum* test. We can summarily dispose of plaintiffs' arguments that WCT does not meet the first and third prong of the test because they focus on WCT's use of the land. WCT has not claimed, and the superior court ·did not find, that WCT's use met the test. As stated earlier, the application of § 462 here turns on the use of the parcel by WCT's predecessor, the Woodstock Baptist Fellowship or Rock Church, not by WCT.

¶ 50. Plaintiffs' argument that the second prong of the test is not met because the church did not benefit an "indefinite class of people" requires us to determine whether, and how, the three-part test should apply in these circumstances. We do not write on a blank slate in this regard. In at least two prior decisions we indicated that the three-part *American Museum* test applied to pious uses. In *Lincoln Street, Inc. v. Town of Springfield*, we stated that "[t]he purpose of § 3802(4) . . . is to benefit the community as a whole by benefiting that indefinite part of the public served by public, pious, or charitable organizations." 159 Vt. 181, 185, 615 A.2d 1028, 1031 (1992). Later, in *Herrick v. Town of Marlboro*, we concluded that we were bound "to extend the 'public use' test to lands sequestered for pious and charitable uses under the statute." 173 Vt. 170, 174, 789 A.2d 915, 918 (2001); see also *In re Abbey Church*, 145 Vt. 227, 230, 485 A.2d 1263, 1265 (1984) (observing that "[t]he purpose of the exemption statute is to benefit an indefinite class of persons who are part of the public.").

¶ 51. Significantly, however, none of these cases actually presented the question of whether the property at issue met the requirement that it benefit an "indefinite class" in order to qualify for the pious-use exemption. *Lincoln* had nothing to do with pious uses. The question there was whether a nonprofit organization "that serves mentally retarded persons" in a leased residential home could claim the exemption, or whether it was available only to the owners of the property. *Lincoln*, 159 Vt. at 182, 615 A.2d at 1029. Construing the third *American Museum* criterion that the "property must be owned and operated on a not-for-profit basis," 151 Vt. at 110, 557 A.2d at 904, we concluded that "the concurrence of nonprofit ownership and use is necessary to make the statute as a whole effective" in serving the legislative intent. *Lincoln*, 159 Vt. at 185, 615 A.2d at 1030. That intent required that "the public or charitable use must confer a benefit on the

public generally," *id.* at 185, 615 A.2d at 1031, which in turn required that the exemption flow to the beneficial users, not the private owners. *Id.* at 186, 615 A.2d at 1031. Nothing in the opinion, despite the language cited earlier, implicated the question of whether a property must benefit an "indefinite class" under the second criterion to qualify as a pious use under the statute.

¶ 52. The same holds true for *Herrick.* There, the question was whether the owner of property which he had set aside or "sequestered" for use by a nonprofit corporation known as the Mountain Ministry, Inc. could claim the pious use exemption, or whether, as we held in *Lincoln,* the statute required the "concurrence of nonprofit ownership and use." 173 Vt. at 175, 789 A.2d at 919. Again we held that the benefit of the exemption must flow to the users, not just the owners. *Id. Abbey Church,* 145 Vt. 227, 485 A.2d 1263, involved a similar question, equally unrelated to the issue before us. The town there did not contest "the issue of pious use." *id.* at 228, 485 A.2d at 1264; the question was whether a property owner who had leased his land to a church was entitled to the statutory exemption, and we held again that the exemption must flow to the church or "pious" user, not the private owner. *Id.* at 230, 485 A.2d at 1265.

¶ 53. ▇▇▇ We have long recognized that the overarching goal of the exemptions set forth in §§ 3802(4) and 462 — including the exemption for "pious" use — is to provide a broad public benefit. As we explained in *Chittenden v. Waterbury Center Community Church, Inc.,* § 462 "includes property dedicated to 'pious' use among a broad class of property the use of which is generally considered sufficiently benevolent to warrant a perpetual exemption from adverse possession claims or prescriptive easements." 168 Vt. 478, 484, 726 A.2d 20, 25 (1998). Indeed, in an early decision construing the statute, the U.S. Supreme Court itself recognized that "good grounds" and sound public policy underlie the exemption in § 462, and that the public retains a "deep and permanent interest" in exempting public, pious, and charitable uses from adverse possession claims. *Soc'y for the Propagation of the Gospel,* 29 U.S. at 505 (cited in *Waterbury Ctr.,* 168 Vt. at 484, 726 A.2d at 25); see also *Am. Museum,* 151 Vt. at 106-07, 557 A.2d at 902 (describing the general purpose of § 3802(4) as the " 'support of schools and churches believed necessary for the encouragement of settlement in colonial . . . Vermont' " (quoting *Brattleboro Child Dev., Inc. v. Town of Brattleboro,* 138 Vt. 402,

405, 416 A.2d 152, 154 (1980)). That policy, as we observed in *Waterbury Center*, is fundamentally rooted in Chapter II, § 68 of the Vermont Constitution,[9] which "protects pious activities as part of a broader class of benevolent objectives." 168 Vt. at 485, 726 A.2d at 25.

¶ 54. The broad public benefit that underlies all of the statutory exemptions, however, is different from the distinctly public character that we require of property in order to specifically qualify as a "public" use. As we explained in *American Museum*, the public-use exemption exists "'for the performance of *service essentially public in nature* . . . and, in so doing, assumes a share of the public burden.'" 151 Vt. at 109, 557 A.2d at 904 (quoting *English Language Ctr., Inc. v. Town of Wallingford*, 132 Vt. 327, 329-30, 318 A.2d 180, 182 (1974)) (emphasis added). We have suggested that a similar public character must inhere in certain "charitable" uses in order to qualify for the statutory exemption. See *MacDonough-Webster*, 2003 VT 70, ¶ 16 (holding that a fraternal lodge which did not "benefit an indefinite segment of the public at large" could not qualify for the charitable-use exemption of § 462).[10]

¶ 55. ▮▮▮ To expect, however, that a church or other property dedicated to "pious" use must perform a similar "service essentially public in nature," much less that it must "directly benefit an indefinite class of persons" to qualify for the statutory exemption, goes beyond the purpose of the statute in this context. Churches may well promote "benevolent objectives" salutary to their adher-

---

[9] This section, in pertinent part, provides:

> All religious societies, or bodies of people that may be united or incorporated for the advancement of religion and learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities, and estates, which they in justice ought to enjoy, under such regulations as the general assembly of this state shall direct.

Vt. Const., ch. II, § 68. By noting the statute's consistency with this constitutional provision, we are not deciding in this case whether the statutory exemptions are constitutionally required. We express no opinion on that question, which is not before us.

[10] It could be argued that the public-use requirement has equally little application to certain nonprofit organizations dedicated to charitable uses that benefit discrete segments of the public, but that issue is not before us, and we therefore express no view on the matter.

ents and society in general but they do not necessarily provide a "service public in nature" nor do they necessarily or invariably serve an "indefinite class" of the public. On the contrary, religious worship is fundamentally a matter of private conscience and practice, and churches vary widely in matters of openness, membership criteria, hierarchy, and selection. To apply the *American Museum* "public use" requirements in a rigorous and honest manner in this context, therefore, would exclude many religious organizations that would otherwise clearly qualify as "pious" in any traditional sense, effectively rendering the exemption a nullity. It is, of course, axiomatic that statutes must not be construed in a manner that would render their language superfluous or lead to irrational results. *In re Lunde*, 166 Vt. 167, 171, 688 A.2d 1312, 1315 (1997) ("Generally, we do not construe a statute in a way that renders a significant part of it pure surplusage." (quotation omitted)).[11]

¶ 56. ▮▮ ▮▮ Notwithstanding the broad language in our earlier decisions, therefore, it is self-evident that the qualifying criteria set forth in *American Museum* and its progeny for public or charitable uses have no application to the pious-use exemption.[12] The question must turn generally, therefore, on whether a property meets the standard for "pious" use, subject to the more limiting requirements of 32 V.S.A. § 3832(2). See *Mahoney*, 2011 VT 3, ¶¶ 10-11 (observing that the focus of § 462 is not on lands "held" by a public, pious or charitable organization but rather on

---

[11] The trial court here, as noted earlier, found no evidence to suggest "that the doors of the church were not open to anyone who wished to attend," and thus in essence applied to the church a presumption that it benefited an "indefinite class." Although we observed in *Lincoln Street* that the "purpose of § 3802(4) . . . is to benefit the community as a whole by benefiting that indefinite part of the public served by public, pious, or charitable organizations," 159 Vt. at 185, 615 A.2d at 1031, it appears more likely that we were describing the general public benefit of exempting churches from the payment of property taxes rather than purporting to establish a broad presumption that religious organizations inherently meet the *American Museum* test. The question of whether the church served an "indefinite class" of the public is immaterial, however, in view of our conclusion that this requirement has no application in the pious-use context.

[12] Because, as noted, our earlier decisions did not address the question presented here, their broad language was essentially nonbinding dicta, and as such need not be specifically overruled. See *Pepin v. Allstate Ins. Co.*, 2004 VT 18, ¶ 16, 176 Vt. 307, 848 A.2d 269 (noting that "dicta . . . is not binding authority"); *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 169 Vt. 310, 348, 738 A.2d 539, 566 (1999) ("Dicta, it need hardly be stated, have no binding precedential effect.").

lands given to "a public, pious or charitable *use*," and holding that while an organization's name may "suggest[ ] it is a pious or charitable organization, the name alone does not reveal whether the *use* of the property was for a privileged purpose"); *Waterbury Ctr.*, 168 Vt. at 487, 726 A.2d at 26-27 (rejecting the notion that making courts the "ultimate arbiters" of what qualifies as "pious" under § 462 results in excessive government "entanglement" with religion). The latter provision, as we have noted, "limits the scope" of the pious-use exemption, *Our Lady of Ephesus House of Prayer, Inc. v. Town of Jamaica*, 2005 VT 16, ¶ 15, 178 Vt. 35, 869 A.2d 145, by excluding

> [r]eal estate owned or kept by a religious society other than a church edifice, a parsonage, the outbuildings of the church edifice or parsonage, a building used as a convent, school, orphanage, home, or hospital, land adjacent to any of the buildings named in this subsection, kept and used as a parking lot not used to produce income, lawn, playground, or garden, and the so-called glebe lands.

32 V.S.A. § 3832(2).

¶ 57. ■ ■ Our task in this regard is made easier by the fact that plaintiffs have not challenged the court's finding that, between 1981 and 2005, the property in question "was owned by a non-profit church and dedicated to religious and community uses." Given the facts of this case, therefore, we easily conclude that WCT's predecessor satisfied the requirement for pious use under the statute. We also have little difficulty concluding that the first and third requirements of the *American Museum* test, in slightly modified form, remain applicable, and are easily satisfied here. As we explained in *American Museum*, the crucial factor under § 3802(4) is the "primary use to which property is put," 151 Vt. at 108, 557 A.2d at 903, and hence that it should be "dedicated unconditionally" to the use for which the exemption is claimed, whether it be public, pious, or charitable in nature. *Id.* at 110, 557 A.2d at 904. The requirement that the "property must be owned and operated on a not-for-profit basis" also applies with equal force to public, pious and charitable uses. *Id.* Here, there was no dispute that the property, when owned by the church, was dedicated to pious use and operated on a nonprofit basis, and plaintiffs have not challenged the court's specific finding in this regard. We therefore

affirm the trial court's conclusion that § 462 applied to parcel 2 to negate plaintiffs' claim for adverse possession.

¶ 58. We now address plaintiffs' argument that plaintiffs hold title to part of parcel 2 by acquiescence. During trial, plaintiffs attempted to prove that David Roy and the Hirschbuhls and WCT's predecessor had acquiesced to a common boundary. See *Okemo Mountain, Inc. v. Lysobey*, 2005 VT 55, ¶ 14, 178 Vt. 608, 883 A.2d 757 (mem.) (stating requirements for establishing boundary by acquiescence). After plaintiffs' case was presented, WCT moved for judgment as a matter of law under V.R.C.P. 50(a)(1) on plaintiffs' claim that a boundary had been established by acquiescence, and the trial court granted it, finding that the boundary-by-acquiescence claim, just like the adverse possession claim that had been rejected at summary judgment, was barred by 12 V.S.A. § 462. As explained earlier, we review judgments as a matter of law de novo. *Gero*, 171 Vt. at 59, 757 A.2d at 476. The question of whether the use of the property between 1981 and 2005 was for public or pious use was determined at the summary judgment phase, and we affirm that finding, as explained in the section above. Therefore, we must address only the legal question of whether 12 V.S.A. § 462 applies to boundary-by-acquiescence claims.[13]

¶ 59. Plaintiffs argue that it does not — that boundary by acquiescence borrows the fifteen year time-period of adverse possession but is not rooted in the timing of filing suit to recover property, and thus the policies behind 12 V.S.A. § 462 do not apply. The trial court, on the other hand, "conclude[d] that the claims . . . being made by the Roys and the Hirschbuhls to modify the boundaries of the property immediately adjacent to the driveway by boundary by acquiescence are, essentially, much too similar to an adverse possession claim not to be barred by § 462." The trial court concluded that the policies behind § 462 were just as applicable to claims of boundary by acquiescence as to adverse possession.

¶ 60. ▆▆ ▆▆ We find ourselves in accord with the trial court. "A boundary is established by acquiescence when there is 'mutual recognition of a given line by the adjoining owners, and such

---

[13] We faced this precise question in *Mahoney* but did not decide it because we remanded for other reasons. 2011 VT 3, ¶ 13.

actual continuous possession by one or both to the line' for the statutory period required to establish ownership by adverse possession." *Lakeview Farm, Inc. v. Enman*, 166 Vt. 158, 162, 689 A.2d 1089, 1091-92 (1997) (quoting *D'Orazio v. Pashby*, 102 Vt. 480, 487, 150 A. 70, 73 (1930)). An element of a claim of boundary by acquiescence is possession for the full statutory period, as defined by 12 V.S.A. § 501, and § 462 limits the applicability of § 501 to lands dedicated to public, pious, or charitable use. The plain meaning of the words in the statute makes it clear that § 462 applies to all actions for which proving the statutory period defined in § 501 is an element.

¶ 61. ■■ ■■ Moreover, we have recognized that the principle underlying the doctrine of boundary by acquiescence is one and the same as that on which adverse possession is based:

> Here, [the landowner] recognized the boundaries by default. [The landowner]'s complete absence from the contested area implies acquiescence to whatever boundary line the [party asserting boundary by acquiescence] observed. This is the principle underlying the doctrine of adverse possession: That a landowner so inattentive as to permit occupation of its land for fifteen years must accept the subsequent loss of title.

*N.A.S. Holdings, Inc. v. Pafundi*, 169 Vt. 437, 446, 736 A.2d 780, 788 (1999). Consequently, the policy behind the § 462 exception — that land should not be "lost to the state and public through the laches or ignorance of the public or of officials representing it," *MacDonough*, 2003 VT 70, ¶ 10 (quotation omitted) — applies with equal force to claims of boundary by acquiescence. We affirm the trial court's decision as a matter of law that plaintiffs' boundary-by-acquiescence claim is barred by 12 V.S.A. § 462.

¶ 62. Next, count IV of plaintiffs' complaint sought a declaratory judgment that the right of way that WCT held through David Roy's land was limited to the use associated with a single-family residence on WCT's parcel, and also sought an injunction to prohibit use of the right of way during the construction process. At the close of evidence, the trial court orally granted WCT's Rule 50 motion for judgment as a matter of law that the easement was not so limited and plaintiffs had no right to stop use of the right of way during construction. Plaintiffs argue on appeal that the judge should not have decided the question of the

scope of the easement as a matter of law but should instead have submitted it to the jury. Again, we review the court's decision de novo, using the same standard as the trial court. *Gero*, 171 Vt. at 59, 757 A.2d at 476.

¶ 63. ■■■ Vermont law is clear that "a [dominant] estate must use a right-of-way in a manner consistent with the use contemplated at the lime of its creation, and it may not use it in a way that materially increases the burden on the servient estate." *Rowe v. Lavanway*, 2006 VT 47, ¶ 22, 180 Vt. 505, 904 A.2d 78 (mem.). However, " '[t]he manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited by the servitude.' " *Id.* ¶ 23 (quoting Restatement (Third) of Property: Servitudes § 4.10.

¶ 64. Testimony by David Roy at trial revealed that the twenty-eight-foot easement in question was originally granted to John Donnelly, who then owned all of the property in question — both the two parcels that WCT now owns and the property now owned by David Roy. When he sold the property to David Roy, he reserved that easement for "ingress and egress" to what is now WCT's property, which was an open lot at the time. David Roy described his understanding of the reason for the unusually large right of way: "I believe the Baptists were interested in buying the property out back and they wanted a wider right-of-way than the twenty-two feet that was existing."

¶ 65. Plaintiffs acknowledge that the easement obtained by Donnelly was for "ingress and egress," and do not suggest that WCT wishes to use the easement for any other purpose.[14] They argue only that the increased use due to WCT's project "exceed[s] the scope of the deed anticipated by the parties at the time the easement was created." They assert, with no reference to the record, that "limited and infrequent travel was anticipated at the time of the execution [of the deed] and historically experienced," and that the proposed project will mean significantly more traffic on the right of way than in the past — either at the time of the execution of the deed including the easement or during the time that the property was being used as a church.

---

[14] Roy testified that, initially, WCT proposed putting parking on the right of way. He said: "They can use it to drive in and drive out and I told them any other use that I would fight them on it."

¶ 66. While we can conceive of situations in which increased use of an easement, even when the type of use is the same as its original use, could be so far above what was originally contemplated that it could be "[in]consistent with the use contemplated at the time of its creation" or could "materially increase[ ] the burden on the servient estate," *Rowe*, 2006 VT 47, ¶ 22, this is not such a case.

¶ 67. "The character of an easement depends on the intent of the parties, as drawn from the language of the deed, the circumstances existing at the time of execution, and the object and purpose to be accomplished by the easement." *Barrett v. Kunz*, 158 Vt. 15, 18, 604 A.2d 1278, 1280 (1992). As noted by the trial court, the right of way is twenty-eight feet wide — much wider than a typical driveway — and Roy himself testified that he understood that it was being created with those dimensions and that the church used it for the public to enter and exit. Furthermore, the language of the easement contained no restrictions whatsoever on the volume of use; we are reluctant to read one into it. The testimony is not consistent with plaintiffs' description on appeal of use limited to that associated with a single-family residence. Furthermore, plaintiffs presented no evidence that WCT's project did not constitute "normal development of the dominant estate," which we found in *Rowe* should be accommodated. 2006 VT 47, ¶ 23.

¶ 68. We agree with the trial court that WCT's proposed use of the right of way does not constitute a violation of the easement, and therefore that plaintiffs' request for an order restricting use to that associated with a single-family residence must be denied.

¶ 69. Plaintiffs' last argument is that the trial court erred when, in its summary judgment order of October 6, 2010, it dismissed without prejudice plaintiffs' nuisance claim for lack of ripeness. At the time of that order, the result of plaintiffs' appeal of the town permit and the Act 250 permit to the environmental court was not yet known, and the court found that, "[g]iven the ongoing nature of the permitting proceedings," it was "not . . . in a position to make any determination as to whether the existing plan constitutes a nuisance." It continued: "If and when the proposed development is finally approved to be built, plaintiffs may assert a cause of action for nuisance based on the noise, light, garbage, and traffic that would be generated by the proposed housing

development as it is required to operate under the terms of its final land use permits."

¶ 70. As we explained in *Wild v. Brooks*, a dismissal of a nuisance claim is proper when the facts related to such a claim are not in existence:

> [A] court may properly enjoin a legally operated business if it finds that its operation creates a substantial and unreasonable interference with another's lawful use and enjoyment of her property, i.e., a nuisance. But as we have explained, this is a multi-factored analysis that should not be conducted when the facts bearing on the analysis are not known.

2004 VT 74, ¶ 17, 177 Vt. 171, 862 A.2d 225. The fact that we have since approved the permits does not change this analysis: "The fact that [some of the facts relied on by the trial court in deciding to dismiss an action for nuisance changed] after the court had entered final judgment does not invalidate a decision that was correct when it was entered." *Id.* ¶ 9.

¶ 71. While they accept the basic rule of *Wild*, plaintiffs contend that "prospective relief for nuisance is available and should be encouraged with proposed projects to minimize waste and delay," and that "less drastic measures" than dismissal of the claim can "address any concerns about the ultimate shape of the project." It is not clear to us what "less drastic measures" plaintiffs were suggesting and dismissing the nuisance claim without prejudice while emphasizing that it can be brought later hardly seems to merit the label of "drastic."

¶ 72. Therefore, we agree with the trial court that at the time the summary judgment order was entered, it was impossible to make any ruling on the nuisance claim as the permits had not yet been approved and the impact of the project on the neighbors could not be fully predicted. Dismissal of the claim without prejudice was therefore proper.

¶ 73. Recognizing that we have now affirmed the permits for this project, we can give a more complete answer on this issue. A court can issue a prospective injunction against a "nuisance *per se*." See *Murphy Motor Sales, Inc. v. First Nat'l Bank of St. Johnsbury*, 122 Vt. 121, 122, 165 A.2d 341, 342 (1960) (dismissing claim for prospective injunction against diner in part

because plaintiff "makes no claim that the operation of the diner will be a nuisance *per se*"); *In re St. George*, 125 Vt. 408, 412, 217 A.2d 45, 47 (1966) ("While a depository for receiving garbage and refuse, such as a landfill operation, may not be a nuisance in itself, it may develop into an unlawful use in violation of the rights of the adjoining owners."); see also *Wernke v. Halas*, 600 N.E.2d 117, 120 (Ind. Ct. App. 1992) (nuisance per se is "that which is a nuisance in itself, and which, therefore, cannot be so conducted or maintained as to be lawfully carried on or permitted to exist" (quotation omitted)); *Sowers v. Forest Hills Subdivision*, 294 P.3d 427, 431 (Nev. 2013) (nuisance per se is a "nuisance at all times and under any circumstances, regardless of location or surroundings") (quotation omitted). In this case, where the residential development has gone through an extensive permitting process both in the town development review board and in the district environmental commission, and both permits have been upheld by the Environmental Division of the superior court and by this Court, we cannot find the development to constitute a nuisance per se. We recognize, however, that even a lawfully permitted project may be a nuisance based on its "conditions or manner of operation." *Trickett v. Ochs*, 2003 VT 91, ¶ 35, 176 Vt. 89, 838 A.2d 66. Thus, dismissal without prejudice fully protected plaintiffs' right to renew the nuisance claim once the impact of the project is known.

¶ 74. We affirm the trial court's dismissal without prejudice of plaintiffs' nuisance claim.

*Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this decision.*